wtk                                                                        1

T6299                GOVERNMENT OF THE DISTRICT OF COLUMBIA

                        DEPARTMENT OF PUBLIC SCHOOLS

                          OFFICE OF STUDENT HEARINGS

- - - - - - - - - - - - - x
                           :
In the Matter of:          :
                           :
D███████ A████████         :
                           :
DOB - ████████, 1989       :
                           :
- - - - - - - - - - - - - x

                                   Washington. D.C.
                                   Monday, May 2, 2005

        A hearing in the above-entitled matter was

convened, pursuant to notice and agreement of the

parties.

BEFORE:

        SY DEBOW, Hearing Officer

APPEARANCES

    On Behalf of the D.C. Public Schools

        RONDALYN STEPHANIE RAMJOHN-MOORE

    On Behalf of the Parent/Student

        TRACY GOODMAN, ESQ.


    [TRANSCRIPT PREPARED FROM A TAPE RECORDING.]

243

wtk                                                                    2

C O N T E N T S

Opening Statement by Counsel for
   Parent/Student                                                     7

Opening Statement by Counsel for
   D.C. Public Schools                                               23

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| David Emmonhizer | 33 | -- | -- | -- |
| Dr. Sheila C. Eiseman | 47 | -- | -- | -- |

E X H I B I T S

| PARENT/STUDENT: | MARKED | ADMITTED |
|---|---|---|
| Exhibits Nos. DA-1 through 40 | -- | 5 |

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003-2802
(202) 546-6666

244

wtk                                                                          3

1                          P R O C E E D I N G S

2              HEARING OFFICER DUBOW:  We're on the

3    record.  Good afternoon, today is May 2, 2005.

4    This is an Administrative Hearing for D████████

5    A███████, who was born on 3/12/1989.  I'll ask the

6    parties to introduce themselves for the record.

7         MS. RAMJOHN-MOORE:  Stephanie Ramjohn-Moore,

8    Attorney Advisor, District of Columbia Public

9    Schools.

10             MS. GOODMAN:  Tracy Goodman [ph], with the

11   Children's· Law Center on behalf of Parent, Corrina

12   Anthony [ph].

13             MS. RINALDI:  Laura Rinaldi, also with the

14   Children's Law Center.

15             MS. ANTHONY:  Corrina Anthony, I'm

16   D████████ mother.

17             MS. FRYE:  I'm Claire Frye [ph], I'm a

18   research assistant and investigator at Children's

19   Law Center.

20             DR. EISEMAN:  Dr. Sheila C. Eiseman,

21   educational consultant for the parent.

22             HEARING OFFICER DUBOW:  Thank you all,

1  very much.  My name is Sy Dubow, Independent

2  Hearing Officer.

3       The hearing is being conducted under IDEA

4  1997, as amended, the [inaudible] rules of the

5  District of Columbia Board of Education, to

6  determine whether or not DCPS acted in accordance

7  with these applicable special education regulations

8  in regard to D████ A███.  I'm Sy Dubow, an

9  impartial Hearing Officer; I'm not an employee of

10  DCPS, nor am I related to or a close acquaintance

11  of the student other than through the hearing

12  process.

13       I will hear both sides and act only on the

14  evidence presented.  Is the formal reading of

15  rights waived?

16       MS. GOODMAN:  Yes.

17       HEARING OFFICER DUBOW:  The formal reading

18  of rights is waived by counsel for the parent and

19  my determination will be submitted within ten

20  working days.

21       This hearing is being recorded and either

22  party may request a copy of the CD.  As a

wtk
                                                                    5

1   preliminary matter, I have documents that are

2   labeled DA-1 through 40, that are entered into the

3   record at this time.

4                      [Parent/Student Exhibit Nos.

5                      DA-1 through 40, admitted.]

6           HEARING OFFICER DUBOW:  And I have a

7   Disclosure Letter for DCPS, correct?

8           MS. RAMJOHN-MOORE:  That's correct.

9           HEARING OFFICER DUBOW:  Any objection to

10  the documents?  If not they're admitted.

11          MS. RAMJOHN-MOORE:  I have a preliminary

12  matter.

13          HEARING OFFICER DUBOW:  Okay, any other

14  preliminary matter, go ahead.

15          MS. RAMJOHN-MOORE:  I have an objection to

16  the April 25, 2005, amendment to the Hearing

17  Request.

18          HEARING OFFICER DUBOW:  This one?

19          MS. RAMJOHN-MOORE:  Yes.

20          HEARING OFFICER DUBOW:  What's the

21  problem?

22          MS. RAMJOHN-MOORE:  The problem is that

1  they're requesting a private school placement in

2  this Hearing Request.

3          HEARING OFFICER DUBOW:  Yes.

4          MS. RAMJOHN-MOORE:  And it was not

5  originally pled in the original March 25, 2005,

6  Hearing Request, which DCPS was prepared to go

7  forward on.

8          HEARING OFFICER DUBOW:  If you will help

9  me with--

10         MS. GOODMAN:  If I may?

11         HEARING OFFICER DUBOW:  Wait one second--

12         MS. GOODMAN:  Sure.

13         HEARING OFFICER DUBOW:  --I just want to

14 compare it.  They did ask for an appropriate non-

15 public, full-time special-ed placement in the

16 original Hearing Request, so I'm going to deny your

17 request.

18         MS. RAMJOHN-MOORE:  Okay.

19         HEARING OFFICER DUBOW:  All right--

20         MS. RAMJOHN-MOORE:  Also, I'd like to

21 state that DCPS is prepared to convene an MDT IEP

22 meeting, within 30 days of this hearing.

wtk

1           HEARING OFFICER DUBOW:  Opening statement,

2    Ms. Goodman.

3           MS. GOODMAN:  Thank you.  As an overview,

4    DCPS has denied a free-and-appropriate public

5    education to D████ A████ for the past eight

6    years.  The student was not identified until

7    September of 2001, when he should have been

8    identified by school year 1997 or 1998, at the

9    latest.  Even once identified, D████ grave

10   mental health needs--mental health issues and need

11   for therapeutic interventions were ignored.

12          Each of D████ five IEPs are

13   inappropriate.  Furthermore, the last two, the most

14   current, are not even being implemented as written.

15   D████ is a 16-year-old boy, diagnosed with

16   chronic paranoid schizophrenia.  He's classified as

17   emotionally disturbed, as well as having a speech-

18   and-language impairment.  This is in DA-2; 12; and

19   4.  Just three years ago, as shown in DA-2, Delonte

20   was hospitalized for auditory hallucinations,

21   distorted thinking, as well as suicidal and

22   homicidal ideation.

wtk                                                                      8

1          The evidence will show today that D██████

2    is struggling in school both behaviorally and

3    academically and that he has been for the past

4    eight years.

5          If you look at DA-15 through 27, we have

6    Stanford-9 student reports, as well as report cards

7    from third-grade through eighth-grade.  If you look

8    at DA-15, which is the SAT-9 scores for 1996 and

9    1997, he was scoring below basic.

10         This is a student who did third-grade

11   twice; he did fourth-grade twice.  It was only

12   after two retentions that the student, D██████, was

13   actually receiving special-education services.

14         Each of he report cards consistently

15   illustrate a student who not only is having

16   academic problems, getting mostly ones and minuses

17   in reading, writing, math, and other academic

18   subjects, but he's also getting unsatisfactory in

19   his work habits and interpersonal and social

20   skills.  And this is the whole way through

21   elementary school; keeping in mind that he did

22   third-grade twice and fourth-grade twice.

1          Specifically, the evidence will show that

2    DCPS denied D██████ a faith in the following

3    manner:

4          The first, and the core of the claim, is

5    the inappropriate educational placement at Francis

6    Junior High School.

7          The evidence will show that D██████

8    requires a full-time, therapeutic special-education

9    placement with the provision of specialized

10   instruction and services that are designed to

11   address his impaired social and emotional

12   functioning; his borderline intelligence; and his

13   speech-and-language disability; along with

14   remediating his lack of academic progress.

15         He needs psychological counseling and

16   speech-and language therapy; and he requires the

17   development and use of a behavior-intervention plan

18   and system; as well as a low student/teacher ratio.

19   And this is shown in DA-1; 3; 4; as well as in DA-9

20   though 12.  He does not get any of these services

21   at Francis Junior High School.

22         The evidence will also show today that

1    personnel at Francis Junior High School, themselves

2    agree that Francis is not an appropriate placement

3    for D██████ and they are at a loss as to what to do

4    with him.

5              Evidence will show that he's failing

6    ninth-grade; he's not making educational progress.

7              HEARING OFFICER DUBOW:  As to that

8    statement--

9              MS. GOODMAN:  I'm sorry.

10             HEARING OFFICER DUBOW:  --can you show me

11   where in the record, if it is in the record, where

12   that is?

13             MS. GOODMAN:  In failing the ninth-grade?

14             HEARING OFFICER DUBOW:  No.

15             MS. GOODMAN:  Oh, the--

16             HEARING OFFICER DUBOW:  The teachers

17   agreeing that Francis isn't an appropriate--

18             MS. GOODMAN:  --that will come out through

19   testimony.

20             HEARING OFFICER DUBOW:  Okay, I didn't see

21   it in the record.

22             MS. GOODMAN:  Right, you're right, yes.  I

wtk
                                                                11

1   did refer to it in the Hearing Request.  But I did

2   not--there's nothing documentary.

3           HEARING OFFICER DUBOW:  It must not have

4   had MDT consensus?

5           MS. GOODMAN:  Right.

6           HEARING OFFICER DUBOW:  I didn't find it.

7           MS. GOODMAN:  And, if you look at DA-12,

8   which is his current IEP, which is dated November

9   18, 2004, it shows the same levels in math and

10  reading--it's on Page 2 of the IEP--it shows the

11  same levels in math and reading as his IEP dated

12  two and a half years prior, DA-8.  So, he's still

13  on the same levels academically.

14          Furthermore, and this is just as

15  disturbingly as that--this current IEP--the

16  November 18, 2004, IEP is not being implemented.

17  Specifically, he is not getting his speech-and-

18  language therapy and possibly more problematic, he

19  is not getting his psychological counseling at

20  Francis.  This is a schizophrenic student with

21  psychotic features who is not even getting

22  counseling, which is on his IEP.

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003-2802
(202) 546-6666

wtk

1          Furthermore, this IEP is inappropriate

2     because it only provides 15 hours of specialized

3     instruction, which is not enough to address all his

4     areas of need.  He--there are no speech-and-

5     language  goals on here--on this IEP.  There are

6     not social and emotional goals in here.  The IEP,

7     itself, also states that he needs--and this is

8     still the November 18 one--2004--it states on Page

9     3 that the needs an intensive instructional setting

10    to address his academic needs.

11         It says participation in nonacademic

12    subjects with nondisabled peers.  But he's not in

13    an intensive instructional setting all the time, he

14    only in it for 15 hours.

15         There's no behavior-intervention plan;

16    there's no provision or discussion of extended-

17    school year services in this IEP.

18         Thirdly, the--well, actually, in reference

19    to this IEP, in addition to the speech-and-language

20    and counseling that's not being implemented, he's

21    actually not receiving the full 15 hours of

22    specialized instruction and that will come out

wtk

1  through testimony where the evidence will show that

2  D██████ is often physically unavailable for the

3  class because he's actually spending time in--with

4  the security guard, in the principal's office, in

5  the hallways or sometimes eating off-grounds.

6          The third issue is the inappropriateness

7  and nonimplementation of the October 3, 2003, IEP,

8  which is DA-11.  This IEP--the evidence will show

9  this IEP was also inappropriate because:  one, it

10 provides only 8.34 hours of specialized

11 instruction, which was actually a reduction by half

12 from the services that he received the previous

13 years and there was no justification for the

14 reduction.  There are no speech-and-language goals.

15 Again, there is no behavior-intervention plan.

16          HEARING OFFICER DUBOW:  What's that prior

17 IEP?

18          MS. GOODMAN:  The prior IEP is the--is DA-

19 11--which is the 10--

20          HEARING OFFICER DUBOW:  Well, I have DA-

21 11, but you said--that is the 1.5, so what's the

22 one before that?

1          MS. GOODMAN:  Oh, okay, the one before

2     that is the October of 2002--

3          HEARING OFFICER DUBOW:  Which is?

4          MS. GOODMAN:  --which is, October 2, 2002,

5     excuse me, is 10.  And what we have there is we

6     don't have the front sheet of that IEP--we only

7     have the notes and part of the goals.  But within

8     the notes, if you look at--it's--

9          HEARING OFFICER DUBOW:  In 01--in 7,

10    you've got five hours.

11         MS. GOODMAN:  Yeah, you've got five, at

12    first, which wasn't enough.

13         HEARING OFFICER DUBOW:  All right.  Then

14    what's--

15         MS. GOODMAN:  So, five and one--

16         HEARING OFFICER DUBOW:  Wait a minute, 8

17    is 02, and that's ten.

18         MS. GOODMAN:  And that's 10, mm-hmm.

19         HEARING OFFICER DUBOW:  And then nine is

20    what?

21         MS. GOODMAN:  And then nine they jump up,

22    if you look at 1, 2, 3, 4--

wtk                                                                    15

 1              HEARING OFFICER DUBOW:  I have 10.

 2              MS. GOODMAN:  --if you look at the seventh

 3   page of notes in DA-10--

 4              HEARING OFFICER DUBOW:  Wait a minute,

 5   I've got nine--all right nine is just the notes.

 6              MS. GOODMAN:  Right, it's just the notes,

 7   oh, I'm sorry, yeah, we're on 10 now--

 8              HEARING OFFICER DUBOW:  Okay, then on 10

 9   is the--

10              MS. GOODMAN:  --which is the October 2002-

11   -

12              HEARING OFFICER DUBOW:  Okay, and then--

13              MS. GOODMAN:  --if you look at Page 7 of

14   that, it's--

15              HEARING OFFICER DUBOW:  Okay.

16              MS. GOODMAN:  It looks like this--oh

17   that's fine, that's okay, go to this last page,

18   then.  Probably that's easier, this page here it

19   says that he requires--

20              HEARING OFFICER DUBOW:  --requires 16.6

21   hours of specialized instruction?

22              MS. GOODMAN:  Yeah, so that--

1          HEARING OFFICER DUBOW:  That would be '02?

2          MS. GOODMAN:  '02, exactly.  And so then--

3          HEARING OFFICER DUBOW:  Then, '03, it went

4   down to 8--

5          MS. GOODMAN:  Yes, exactly.  Okay--

6          HEARING OFFICER DUBOW:  And the next one

7   is 12?

8          MS. GOODMAN:  --right, but just in

9   reference to 10-303, the DA-11, which--that is the

10  IEP that he started with at Francis Junior High

11  School.

12         HEARING OFFICER DUBOW:  Correct.

13         MS. GOODMAN:  So, in addition to it being

14  inappropriate for not giving him enough services--

15  not enough specialized instruction, and no speech-

16  and-language goals, no behavior-intervention plan,

17  it also wasn't being implemented as written because

18  he did not receive his speech-and-language therapy

19  or his counseling last year, either, at Francis.

20  So, for the past year and a half, he hasn't gotten

21  any therapeutic interventions at all; nor has he

22  gotten his speech-and-language therapy that's on

wtk

1  his IEP. So, we're talking about a prima facie

2  violation of--it's a nonimplementation of the IEP.

3       Now you're back to 12, let's see, that's

4  his current one.  So, even though the counseling

5  and the speech-and-language is on there, he's not

6  getting it.

7       The IEPs that we just briefly looked at;

8  the first one, dated September of 2001 and then the

9  DA-8, dated May of 2002; as well as the October of

10  2002, they're also inappropriate because D██████

11  had not received the level of instruction that he

12  needed.  There was, also, no behavior-intervention

13  plan in any of these.  There's no counseling.

14  There was no consideration of ESY.

15       And what's alarming with these first three

16  IEPs is that--and the evidence--it already in

17  documentary evidence, the evaluations, exhibits

18  three through six, these are evaluations that DCPS

19  conducted and hadn't been--there is an outside one

20  there, but DCPS evaluations and DCPS reviews of

21  evaluations, they identify grave concerns about

22  D████████ mental health, but, yet, these IEPs, the

wtk

1    first two IEPs, September of 2001 and May of 2002,

2    do not address any of his social and emotional

3    needs; do not provide any type of counseling or

4    therapeutic interventions.  The IEP only addresses

5    his speech-and-language impairment.

6         And, as pointed out briefly, the first IEP

7    only gave him five hours in specialized instruction

8    when it also stated that he needed specialized in

9    reading, math, written expression, as well as

10   services in social and emotional and speech-and-

11   language, but they only gave him five hours.  It's

12   impossible to do all that in five hours.

13        And the fifth issue is DCPS' failure to

14   wholly and timely evaluate D██████.  DCPS hasn't

15   conducted timely re-evaluations.  The most-recent

16   psychological evaluation was May 14 of 2001; the

17   most-recent speech-and-language was July 11, of

18   2001; they're over due.

19        HEARING OFFICER DUBOW:  4/9/04 DA-1, was

20   an independent--private?

21        MS. GOODMAN:  Yes, exactly, which was

22   provided to the school.  The sixth issue is the

1   violation of Child Find, which the parent's claim

2   covers September of 1997 through September of 2001,

3   the date he was first identified.   Specifically,

4   the evidence to prove that is that, well, one,

5   D███████ is diagnosed--through DCPS's own

6   evaluation--with a speech-and-language impairment.

7   And evidence will show that's a disability which is

8   developmental in nature and, therefore, would

9   manifest itself in the developmental phase.   Yet,

10  D.C. did not pick up on it at all over seven years

11  of school failures.   So, we're talking

12  kindergarten, first, second, third, third again,

13  fourth, fourth again, and then they pick up on a

14  developmental problem.

15          In addition to the presence of the speech-

16  and-language impairment, evidence will show, as

17  pointed out briefly before in DA-15 through 27,

18  that D███████ was scoring below basic on all of his

19  SAT-9 testing, as early as November of '96; he was

20  displaying tremendous difficulties in the classroom

21  with learning and behavior all through elementary

22  school; failed both third- and fourth-grades.

wtk

1       At the very latest, he should have been

2   identified at the end of his first year in third-

3   grade.  And those are DA-15, I'm sorry, 15 and 16,

4   are the SAT-9 scores.  And the third-grade report

5   cards are DA-18 and 20.

6       And actually both of the third-grade

7   report cards show this below instructional levels

8   in reading and math and written expression and

9   unsatisfactory work habits and personal and social

10  skills.  And, also, the teacher notes in both of

11  those--in those grades, increasing concerns with

12  D▒▒▒▒▒▒ behavior and antisocial interactions with

13  others.

14      So, in sum, Delonte, Ms. Anthony--we think

15  Ms. Anthony's claim should prevail because the--all

16  the IEPs are inappropriate for the reasons that

17  there was an inappropriate level of services--an

18  inappropriate level of services now, he needs full-

19  time; lack of necessary-related services.  He's not

20  getting speech-and-language therapy and counseling;

21  there's no behavior-intervention plan; no ESY, and

22  they're not being implemented.

1          The placement's inappropriate and, then,

2     also, the Child Find violation, which does cover a

3     period of four years.  And, as a remedy, we're

4     seeking immediate funding and placement of Delonte

5     at the High Roads Upper School, a therapeutic,

6     full-time program that can meet D███████ needs.

7          We're also requesting compensatory

8     education for eight years.

9          HEARING OFFICER DUBOW:  All right.  There

10    has been no evaluation in the file the child has a

11    learning disability?  Ted Bender's [ph] report, he

12    doesn't recommend it one way or the other.  Is that

13    not correct, even though he finds a significant

14    discrepancy in the reading score?

15         MS. GOODMAN:  That's right--there's a--

16         HEARING OFFICER DUBOW:  So, if there would

17    have been a determination by an examiner that he

18    doesn't have a learning disability?

19         MS. GOODMAN:  That's true, there's no

20    diagnosis--specific diagnosis of a learning

21    disability.

22         HEARING OFFICER DUBOW:  Even though

wtk                                                                    22

1  [inaudible] Mr. Bender would indicate he does on

2  the reading?

3          MS. RAMJOHN-MOORE:  Well, I did read in

4  one of the evaluations, or maybe it was in one of

5  the notes, it said that the discrepancy wasn't

6  severe and that's why he didn't qualify as a

7  student for learning disability.

8          HEARING OFFICER DUBOW:  Yeah, I mean, I'm

9  just--it says learning disability as a

10  determination, Mr. Bender's report, at 1/17/01,

11  that reading discrepancy score, minus 2.20, right?

12  That's two standard deviations?

13          MS. GOODMAN:  Mm-hmm.

14          HEARING OFFICER DUBOW:  Which is normally

15  considered significant.  Then, he says, D_____ is

16  functioning at a borderline level intellectually,

17  but succeeding in academic achievement usually

18  beyond what would be expected.

19          MS. RAMJOHN-MOORE:  Mm-hmm.

20          HEARING OFFICER DUBOW:  No, idea where Mr.

21  Bender gets his material.  All right.  So, in other

22  words, it might be possible he's also learning

1   disabled--is it possible?

2           MS. GOODMAN:  I mean, it's possible that--

3   that--

4           HEARING OFFICER DUBOW:  But that's not

5   what you're--

6           MS. GOODMAN:  Right, that's not our

7   contention.

8           MS. RAMJOHN-MOORE:  May I address that?

9           HEARING OFFICER DUBOW:  You have the

10  opening, yes.

11          MS. RAMJOHN-MOORE:  Hearing Officer,

12  DCPS's contention that throughout the several

13  meetings--MDT meetings set up occurred over the

14  years, D██████, mother or the Children's Law

15  Center were represented at those meetings and were

16  part of the team that determined how many hours of

17  specialized instruction, psychological counseling,

18  speech-and-language the student would be receiving.

19  And to now come today, May 2, 2005, and say that

20  all of those IEPs were inappropriate is

21  disingenuous.  DCPS has been on the table on

22  several occasions for this student and we have

wtk

1  provided a free-and-appropriate public education.

2       And, if at the time when these IEPs were

3  being constructed at the table, you would think

4  that the notes would indicate if the parent or the

5  representatives were in disagreement with the

6  number of hours being given to the student.  That's

7  not the case here.  None of the IEPs; none of the

8  MDT notes indicate that the parent nor the

9  representatives were in disagreement with the

10 amount of hours that were delivered to this

11 student.

12      In fact, they were represented and signed

13 their names.  And the parent signed her name that

14 she was in agreement with the majority of the IEPs.

15      HEARING OFFICER DUBOW:  All right, now

16 let's see.  As to DA-8, which is the '02 one.

17      MS. RAMJOHN-MOORE:  Mm-hmm.

18      HEARING OFFICER DUBOW:  The parent signed

19 agreement and only the parent appears to be present

20 at that one.

21      MS. GOODMAN:  Yes, if I may be--

22      MS. RAMJOHN-MOORE:  Yes.

wtk

1          HEARING OFFICER DUBOW:  And then the DA-

2     11, since we don't have a front-page on the one

3     prior--DA-11, the parent is there, a step-father

4     and he co-signed agreement with the IEP.  At DA-12,

5     we have the parent and it looks like an educational

6     advocate--

7          MS. GOODMAN:  It was Claire Fry, who was

8     there, as the note-taker.

9          HEARING OFFICER DUBOW:  Okay, but there's

10    no signing off on that?

11         MS. GOODMAN:  Right.

12         HEARING OFFICER DUBOW:  So that's what we

13    have, right, okay.

14         MS. GOODMAN:  The parent's signature on an

15    IEP does not void DCPS's responsibility--

16         HEARING OFFICER DUBOW:  Yeah, I know I was

17    just trying to follow what it was she was saying.

18    So the IEPs prior to the current one, and it's

19    signed, but the current one she did not sign.  And

20    the ones prior to the current one, there was no

21    educational advocate?

22         MS. GOODMAN:  Correct.

wtk

1          HEARING OFFICER DUBOW:  Whereas the

2   current one where she did not sign, she had an

3   educational advocate, according to the front sheet,

4   is that right?

5          MS. GOODMAN:  Correct.

6          HEARING OFFICER DUBOW:  Okay, thank you.

7   Sorry, go ahead, Ms. Ramjohn-Moore.

8          MS. RAMJOHN-MOORE:  And just pointing you

9   out also to the MDT notes which follow--

10          HEARING OFFICER DUBOW:  Which ones?

11          MS. RAMJOHN-MOORE:  --the 11/18/04 IEP,

12   and which the parent did not sign.  The notes are

13   there and there's no mention that the parent, nor

14   the advocate are in disagreement with the number of

15   hours provided to the student.  In fact, it goes on

16   to document how many hours of service the student

17   would be receiving and why.

18          HEARING OFFICER DUBOW:  That's at that--

19   [inaudible] page?

20          MS. RAMJOHN-MOORE:  yes.

21          HEARING OFFICER DUBOW:  All right.  Go

22   ahead.

1          MS. RAMJOHN-MOORE:  As I stated earlier,

2    prior to the opening statement, DCPS recognizes

3    that they have tried to accommodate D▬▬▬ in

4    several placements.  Unfortunately, some of them

5    have not been successful.  And, as I stated

6    earlier, we are willing to convene an MDT meeting,

7    again to review the most current evaluation to,

8    perhaps refer him for further evaluation and to

9    find an appropriate placement for him.

10         HEARING OFFICER DUBOW:  As I understand

11   Mr. Neil [ph], the child was going to Shaw?

12         MS. RAMJOHN-MOORE:  Yes.

13         HEARING OFFICER DUBOW:  And had an

14   altercation where he broke his left leg?

15         MS. RAMJOHN-MOORE:  Yes.

16         HEARING OFFICER DUBOW:  Fell down the

17   steps or something like that?

18         MS. RAMJOHN-MOORE:  Yes.

19         HEARING OFFICER DUBOW:  And then we had a

20   meeting--the parent had a meeting with Mr. Neil and

21   Mr. Neil did a transfer to Francis?

22         MS. RAMJOHN-MOORE:  Yes.

1              HEARING OFFICER DUBOW:  So, he started

2    Francis, when, mid-year?  When did he start?

3              MS. GOODMAN:  He started in January of

4    2004.

5              HEARING OFFICER DUBOW:  So he started

6    January--

7              MS. GOODMAN:  He's been there a year and a

8    half.

9              HEARING OFFICER DUBOW:  Okay, started

10   Francis, January '04.  All right.

11             MS. GOODMAN:  Yes.

12             HEARING OFFICER DUBOW:  All right.

13             MS. RAMJOHN-MOORE:  That's all I have.

14   Not being successful is not a denial of faith,

15   especially when DCPS has provided the IEPs and has

16   implemented them in accordance with--as they were

17   written by the MDT that was convened at that time.

18             HEARING OFFICER DUBOW:  Okay, do you have

19   any witnesses to put on at this time?

20             MS. RAMJOHN-MOORE:  I do not.

21             HEARING OFFICER DUBOW:  And you'll rely on

22   the documents?

1          MS. RAMJOHN-MOORE:  I will rely on the

2   documents as submitted.

3          HEARING OFFICER DUBOW:  All right.

4          MS. GOODMAN:  It's at this point that I

5   make the Motion for a Directed Verdict.  There's no

6   evidence presented, there's no documents that DCPS

7   has set forth.  All of the issues set forth in the

8   Hearing Request remain unrebutted.  What Ms.

9   Ramjohn-Moore has stated in her opening are no

10  defenses to any of the claims presented by the

11  parent.  And, as such, since DCPS cannot meet its

12  burden today, with no evidence.  There should be a

13  finding for the parent and the only issues, then

14  would be the compensatory education award and then

15  the appropriateness of the parent's proposed

16  placement.

17         HEARING OFFICER DUBOW:  Any response to

18  that, Ms. Ramjohn-Moore?

19         MS. RAMJOHN-MOORE:  I think that it would

20  be a disservice to the system if the Children's Law

21  Center were able to secure eight years of

22  compensatory education and the private placement

1   based on an unsuccessful placement

2         DCPS has found this child eligible;

3   they've convened MDT meeting, after MDT meeting.

4   He's had different placement, different hours.

5   They've tried everything in agreement with the

6   parent.  And I think that the remedy should match

7   the denial, if you find any.

8         But I don't see where there's been a

9   denial--a refusal to give services.  There have

10  been services delivered.  And I'd just ask the

11  Hearing Officer to consider that when making his

12  decision.

13        HEARING OFFICER DUBOW:  All right, well, I

14  think the law is clear that, as counsel for the

15  parent has pointed out that the burden switches to

16  the parent as to compensatory education and the

17  appropriateness of the private placement.  So, I

18  will hear evidence as to that.  At the present

19  time, I'm going to grant your motion as to the--I

20  have no evidence from DCPS as to they provided

21  faith but that they implemented these IEPs or that

22  the child has made progress of any kind, no

1   evidence.  And, if anything, the evidence of the

2   report cards are DCPS and the Stanford 9 shows that

3   he's struggling, he's below basic on everything.

4   So, I don't have anything to indicate that the

5   program being offered has made--the child has made

6   any progress and received any benefit.

7           Open to hearing a witness, but you don't

8   have any.  Based on the documents, which are all

9   from the Children's Law Center, their documents

10  show he's not academic.  So, in that sense, I'll

11  grant your motion.  But I--the burden now shifts to

12  you as to the appropriateness of High Roads and as

13  to the--

14          MS. GOODMAN:  The comp-ed issue.

15          HEARING OFFICER DUBOW:  --the comp-ed

16  issue.

17          MS. GOODMAN:  Okay.

18          HEARING OFFICER DUBOW:  So, I'll hear

19  evidence on those two issues.

20          MS. GOODMAN:  All right.  Thank you, Mr.

21  Dubow, if I may, just have a moment.

22          HEARING OFFICER DUBOW:  Let's deal with

wtk                                                                        32

1    the High Roads issue first.

2              MS. GOODMAN:  Okay.  In that case, I'd

3    like to place a call to David Emmonhizer [ph], at

4    High Road Upper School.

5              HEARING OFFICER DUBOW:  All right.

6              MS. GOODMAN:  Do nine to get out of here?

7              MS. RAMJOHN-MOORE:  Yes.

8              MS. GOODMAN:  [Places telephone call.]

9    This is Tracy Goodman from the Children's Law

10   Center.  I'm looking for David Emmonhizer for

11   testimony at a hearing.  Thank you.

12             [Lengthy pause.]

13             MS. GOODMAN:  I'm on hold for David

14   Emmonhizer.  Thank you.

15             [Lengthy pause.]

16             MS. GOODMAN:  Hi, Mr. Emmonhizer, this is

17   Tracy Goodman.  I'm going to put you on speaker

18   phone, we're in the hearing room.

19             HEARING OFFICER DUBOW:  Hello.

20             MR. EMMONHIZER:  Hello.

21             HEARING OFFICER DUBOW:  How are you doing?

22             MR. EMMONHIZER:  I'm doing very well, how

wtk                                                                33

1    about you?

2           HEARING OFFICER DUBOW:  Good, this is the

3    Hearing Officer.  I'm going to ask you to raise

4    your right hand.

5        Whereupon,

6                    DAVID EMMONHIZER

7    was recalled as a witness and, having been

8    previously duly sworn by the Hearing Officer, was

9    examined and testified as follows:

10          THE WITNESS:  I do.

11          HEARING OFFICER DUBOW:  Ms. Goodman's

12   going to ask you some questions to be followed by

13   Ms. Ramjohn-Moore.

14                  DIRECT EXAMINATION

15          BY MS. GOODMAN:

16      Q    Will you, please, state your name for the

17   record?

18      A    David Emmonhizer.

19      Q    Where do you work?

20      A    At High Road Upper School of Washington,

21   D.C.

22      Q    What's your position there?

wtk

1     A   I am the school director.

2     Q   And what does your job entail?

3     A   I'm responsible for the administrative, as

4  well as educational/instructional day-to-day

5  functioning of the school.  I supervise staff and

6  students and I am, you know, I'm sorry--I work on

7  admissions of new students.

8     Q   And has anyone at High Road met D██████?

9     A   Yes.

10    Q   In what context?

11    A   He came--he and his mother, I believe,

12 came on a school tour.

13    Q   And have you had an opportunity to review

14 D██████████ evaluations and IEPs?

15    A   Yes, I have.

16    Q   Can you describe D█████████ visit to the

17 school?

18    A   I'm sorry.

19    Q   Can you describe D█████████ visit to the

20 school?

21    A   Yes, he came in--he met with the staff

22 discusses what he's looking for, what the parent's

1    are looking for in terms of school placement and

2    then does tour of the school.

3         Q    And how many students attend High Road

4    Upper School?

5         A    Right now we have 41.

6         Q    And what ages and grades does the school

7    serve?

8         A    Ages 13 to 21, basically, late eighth-

9    grade through twelfth-grade.

10        Q    And does High Road have a program for

11   students with emotional disturbance and learning

12   problems?

13        A    Yes.

14        Q    Are the teachers certified special-

15   education teachers?

16        A    Yes.

17        Q    What about the teachers in the class that

18   D‑‑‑‑‑‑‑ would be in, are they certified special-ed

19   teachers?

20        A    Yes.

21        Q    Can you describe--

22             HEARING OFFICER DUBOW:  What is that, is

wtk                                                                         36

1    that a yes or is that a Bronx yes?

2              THE WITNESS:  I'm sorry?

3              HEARING OFFICER DUBOW:  Is that a yes or a

4    Bronx yes?

5              THE WITNESS:  A brunch yes?

6              HEARING OFFICER DUBOW:  No, I'm not going

7    to speak Yiddish to you?  Yes, right, Yiddish, yes,

8    yes.

9              THE WITNESS:  Yes.

10             HEARING OFFICER DUBOW:  Say, yes, for the

11   record, go ahead.

12             BY MS. GOODMAN:

13        Q    Can you describe the educational program

14   for students with ED, along with borderline

15   academic functioning, such as D██████?

16        A    We have an individualized instruction

17   program that we call rotations.  They work one-to-

18   one with teachers to get the instruction and new

19   material.  And then they would work on the

20   computerized programs or with the TA to get

21   practice in that.  And then work at their seat, as

22   well, so it becomes automatic.

1            And they rotate between those in any of

2    their language-art skills, like reading, writing,

3    spelling, as well as math.

4            And they go through that in terms of that

5    rotation through the morning until approximately

6    11:00 o'clock.  And they would stay in the same

7    classroom during that time.

8            And then from 11:00 to 3:00 we have more

9    of what we call the content classes and that's

10   science, history, foreign language, things like

11   that.  And for those classes, students do change

12   classes.

13       Q    And do students transition from class-to-

14   class?

15       A    During those content classes, yes.

16       Q    And what is the teacher/student ratio in

17   the class D█████ would be in?

18       A    D█████ would be in a class that would

19   have, he would be the 10th student in that

20   classroom.

21       Q    And how many teachers or  how many

22   staffers in the class.

wtk

38

1      A    Every class has a teacher and TA, so there

2    would be two.

3      Q    Okay, so that's a 5-to-1 teacher/student

4    ratio?

5      A    That is correct.

6      Q    Does High Road have a behavior-

7    intervention plan for the students?

8      A    Yes, we do.  We have a level system and a

9    point-sheet each day that the students earn points

10   and give direct feedback on their behavior.  And

11   then that translates into a level system that they

12   earn certain privileges and different things like

13   that, based on moving up the level system.

14     Q    And that's something that's implemented

15   daily in each class?

16     A    Yes, yes, all of our students have that

17   every day.  They get feedback every half hour and

18   then they get their point sheet at the end of the

19   day.  And then the new level that they earned for

20   the following day.

21     Q    And is such a program appropriate for

22   D▬▬?

1      A    Yes, I believe it is.

2      Q    And what disabilities do the other

3   children in the class D████████ would be have?

4      A    Most of them would have, I guess,

5   technically, a multi-label with an ED as a primary.

6   We have a few that are solely ED and we also have

7   some that have maybe an OHI and LD as secondaries.

8      Q    And you testified earlier that students

9   switch classes in the afternoon.  If a student,

10  such as D██████, has trouble with transition, what

11  can High Road do to address this?

12     A    Well, first of all, I mean, it would be

13  very difficult for the student to have difficulty

14  transitioning, just because we're a small school.

15  And it's very few steps between classrooms.  But,

16  if the student is having difficulty then, I mean,

17  there's close monitoring that can occur and staff

18  being out in the hallway can basically see from

19  room-to-room.  Or if it gets to a certain point,

20  then we would have, I mean, we could even escort.

21     Q    And how often do students in what would be

22  D████████'s class interact with the students in the

wtk

40

1  rest of the school?

2      A    I'm sorry, how often?

3      Q    Yeah, how often during the day do the

4  student's in D██████ class interact with students

5  in the rest of the school?

6      A    Well, when we're talking about the content

7  classes, there would be some--potentially, there

8  could be some class, you know, a different student

9  mix, in each of the classes.  In terms of all of

10  the students of the school getting together--

11  whenever students change classes, all the students

12  are out in the hallway.  But we also have certain

13  earned activities or motivational activities

14  throughout the week that students would be mixed

15  among the classrooms.

16      Q    D██████ is classified as emotionally

17  disturbed, yet he also has low-academic functioning

18  and is speech-and-language impaired.  How will High

19  Road address this combination of needs?

20      A    Well, we, that's exactly why we do the

21  one-to-one  instruction because there's nobody

22  necessarily there's no one else in the classroom

1    that's going to be on his exact level.  And what we

2    would do is the direct instruction with the teacher

3    allows D█████ to work at his own pace.  So, if he

4    learns, let's say, multiplying fractions in a day,

5    he can move on to the next subject and nobody else

6    has to keep up with him.  But if it would take him

7    two weeks, also, nobody else has to wait for him.

8    So, he really can just learn at his own pace with

9    the teacher and then working individually in the

10   computer and with the TA.

11        We also have pull-out speech-and-language

12   services and counseling services that would be able

13   to support that, as well.

14   Q    And D█████ has significant problems in

15   his current placement with getting along with

16   peers; isolation from other students; being a

17   target for bullying and actually starting fights,

18   himself.

19   A    Mm-hmm.

20   Q    How will High Road be able to address this

21   and help minimize these sorts of behaviors?

22   A    Well, I think one of the things is that

wtk                                                                          42

1    we're a small therapeutic placement.  A classroom

2    with 10 students with two staff, we often get to

3    see the beginnings of problems even before they

4    would ever become, you know, what a typical school

5    would call a problem.

6          And since we do give the feedback on every

7    half hour to the students, they also hear from us

8    what we're seeing and what they can do to improve.

9          Q    Are the staff trained in any type of

10   therapeutic- intervention techniques?

11         A    Yeah, that was actually going to be the

12   next part, yes.  All of our staff are trained in

13   PAC-2 [ph], which is a therapeutic procedure that

14   deals with any sort of aggressive or, you know,

15   dangerous sort of behaviors or anything like that

16   that begins with dealing with people--dealing with

17   the thoughts and the feelings in a verbal way and,

18   then, if necessary, even up to restraint and

19   putting our hands on the students and maintaining

20   control that way.

21         Q    And does--D█████ also displays signs of

22   significant depression, has low self-esteem and

wtk                                                                        43

1    demonstrates antisocial behavior.  How will High

2    Road address this?

3         A    Well, our model believes in working from

4    strengths and, so, we would work with a student

5    with D███████ or any other student with what they

6    currently are proficient in.  So that he can get a

7    sense of success and a sense of competency, and

8    then working from that and through that, toward the

9    areas that are the weaknesses for him.

10        Q    In terms of specifically the antisocial,

11   we have a group, twice a week that focuses on a

12   social skills kind of curriculum that would deal

13   with different values, things like getting along

14   with one another; commitment, things like that.

15        Q    What about D████████ diagnosis of

16   schizophrenia?  Are there other students who carry

17   serious psychiatric diagnoses at High Road?

18        A    Yes, yes, we have several students here

19   who are--who carry psychiatric diagnoses.

20        Q    And his current IEP calls for

21   psychological counseling and speech-and-language

22   therapy.  Does High Road have the ability to

wtk

44

1    provide both of these services?

2        A    Yes, we do.  We licensed social workers on

3    staff and we have a licensed speech-and-language

4    pathologist who comes in on a contractual basis.

5        Q    Does High Road have the ability to conduct

6    a speech-and-language evaluation of Delonte?

7        A    Yes, we do.

8        Q    Can you describe any other educational

9    services that have not been mentioned that will be

10   available for D▓▓▓▓▓?

11       A    The only other area that I can think of

12   is, maybe, transition.  As students get older and

13   ready to graduate, we work with students to find

14   out what the next phase of their life, what their

15   career goals are; what their college goals are and

16   helping them learn how to fill out those

17   applications, get that information and be prepared

18   for that.

19       Q    Will High Road be able to provide the

20   necessary services that D▓▓▓▓ requires?

21       A    Yes.

22       Q    Based on your knowledge and experience,

wtk                                                                    45

1    would High Road be able to provide D████████ an

2    appropriate education?

3         A    Yes.

4         Q    And how can we ensure that D███████ would

5    be getting an appropriate education?

6         A    Well, we would begin by basing it on his

7    current IEP and then at 30-day review or whenever

8    the Hearing Officer would determine, that we would

9    hold a meeting to assess progress.

10        Q    And has D███████ been accepted at High

11   Road?

12        A    Yes, he has.

13        Q    And when could D███████ begin attending

14   High Road?

15        A    We have slots immediately.

16        Q    And do you have an extended school year

17   program at High Road.

18        A    Yes, we do.

19        Q    Can D██████ do that, as well?

20        A    Thank you, I have no other questions.

21        Q    Okay.

22             HEARING OFFICER DUBOW:  Ms. Ramjohn-Moore?

wtk

1      MS. RAMJOHN-MOORE:  I have no questions

2  for this witness, thank you.

3      HEARING OFFICER DUBOW:  Thank you very

4  much.

5      THE WITNESS:  Thank you.

6      MS. GOODMAN:  Thank you.

7      HEARING OFFICER DUBOW:  Any other

8  witnesses, you have?

9      MS. GOODMAN:  I will call on Dr. Sheila

10  Eiseman.

11      HEARING OFFICER DUBOW:  Sheila, why don't

12  you sit in that, because I only have one mic.

13      Whereupon,

14              DR. SHEILA C. EISEMAN

15  was recalled as a witness and, having been

16  previously duly sworn by the Hearing Officer, was

17  examined and testified as follows:

18      THE WITNESS:  I do.

19      HEARING OFFICER DUBOW:  Please state your

20  full name for the record.

21      THE WITNESS:  Dr. Sheila C. Eiseman.

22      HEARING OFFICER DUBOW:  And your

1  occupation?

2         THE WITNESS:   Educational Consultant for

3  students with special needs.

4         HEARING OFFICER DUBOW:   Your witness,

5  counselor.

6                      DIRECT EXAMINATION

7         BY MS. GOODMAN:

8      Q    Dr. Eiseman, what is your educational

9  background?

10        HEARING OFFICER DUBOW:   If you can put the

11  mic so you [Technical interruption.]

12        BY MS. GOODMAN:

13     Q    Dr. Eiseman, what is your educational

14  background?

15        HEARING OFFICER DUBOW:   Her Vitae is in

16  the record.

17        MS. GOODMAN:   Then I proffer now that

18  Sheila Eiseman be qualified as an expert in special

19  education.

20        HEARING OFFICER DUBOW:   And DCPS, agree.

21        MS. RAMJOHN-MOORE:   I have no objection.

22        HEARING OFFICER DUBOW:   So certified as an

wtk                                                                    48

1    expert in special education.

2              BY MS. GOODMAN:

3         Q    Dr. Eiseman, are you familiar with D███████

4    A███████?

5         A    I am.

6         Q    How are you familiar with him?

7         A    He was first referred to my office by our

8    office, Children's Law, November 22, 2004.  After

9    that period of time, I spent some time talking with

10   the parent, Ms. Anthony.  I also reviewed documents

11   that are present in disclosure today.  I visited

12   him at Francis Junior High, observed him in class

13   and talking with various staff members.  And that

14   was December 14, 2004.  And I visited the High Road

15   School in D.C. after doing extensive school

16   exploration for him.

17             He was accepted at High Road and so, I did

18   go to see the program that they would offer him.

19             BY MS. GOODMAN:

20        Q    You testified that you reviewed the

21   documents in disclosure.  Did you review all of the

22   documents disclosed by the parent?

1      A    I did.

2      Q    Now, can you please D███████ educational

3    strengths and weaknesses?

4      A    Yes, D██████ is a youngster who is 16

5    years old, he recently turned 16.  His cognitive

6    profile, he has been tested several times and come

7    out at the borderline range of intelligence.  I

8    have to tell you for my expert opinion, I question

9    that a great deal.

10          HEARING OFFICER DUBOW:  You question the

11    progress that he's mildly mentally retarded?

12          THE WITNESS:  Or to the borderline range

13    which has also been stated.

14          HEARING OFFICER DUBOW: Okay--

15          THE WITNESS:  The reasons being that his--

16          HEARING OFFICER DUBOW:  --that was in the

17    last report that Howard University did, is that

18    right ?

19          MS. GOODMAN:  Yes.  And in the DCPS

20    evaluations, too, like--

21          THE WITNESS:  Yes, they're fairly

22    consistent in those ranges.  But his academic

50

1  scores are far in excess of what you would find his

2  IQ to be, that is the first thing.  So that in

3  2001, when he was tested, he had a basic reading

4  score on the WEA [ph], at 108, which I don't think

5  a youngster with that IQ is capable of doing--you

6  know, he's shown some regression over the years, so

7  that when he was tested 4/04, that reading came

8  down to an 81.  So, he lost a lot.

9      His spelling, for instance, went down in

10  2001 from 100 to an 82, in 2004.  His math

11  comprehension also suffered greatly, 20 points.

12  This indicates a difficulty that has more to do

13  with his emotional needs than it does with his

14  actual intelligence.  He's not scoring as well on

15  the tests of academics because of increasing

16  emotional needs.  But he also has difficulty in

17  terms of IQ tests.  I just don't see it physically

18  possible that a youngster with that IQ is going to

19  do this well academically.

20      He also has some real language issues--

21  speech-and-language issues.  And these IQ tests

22  that he was given are heavily language loaded.  But