1  I think the bigger problem is, probably, the

2  emotional problems.

3          So, that speaks to the difficulties that

4  we've had looking at the testing in terms of his

5  IQ.

6          HEARING OFFICER DUBOW:  So, the last test

7  that was done by Howard University, what did they

8  find, his IQ, they had verbal IQ 67; performance

9  54--

10         THE WITNESS:  That's correct.

11         HEARING OFFICER DUBOW:  --full-score IQ,

12  57?

13         THE WITNESS:  Yes.

14         HEARING OFFICER DUBOW:  And you're saying

15  that's not accurate because?

16         THE WITNESS:  I--

17         HEARING OFFICER DUBOW: What is the score--

18         THE WITNESS:  --I can't imagine--

19         HEARING OFFICER DUBOW:  --okay--

20         THE WITNESS:  --I mean, taking--

21         HEARING OFFICER DUBOW:  --well, let's go,

22  okay compare.  Now, [inaudible] earlier test, what

wtk                                                                      52

1  was the IQ in the '01 testing documents?

2          THE WITNESS:  It was--the document you

3  would be looking at there would be the '05--

4          HEARING OFFICER DUBOW:  The famous Mr.

5  Benders or no?

6          THE WITNESS:  The--

7          HEARING OFFICER DUBOW:  The clinical.

8          THE WITNESS:  It would be the

9  psychological evaluation by Tracy Ross Canfield

10  [ph].

11          MS. GOODMAN:  It's five, right.

12          THE WITNESS:  If you take a look at that,

13  it speaks to the difficult--I'm sorry, I'm telling

14  you the wrong one--the one with the IQ test--

15          HEARING OFFICER DUBOW:  Isn't that Bender?

16          THE WITNESS:  --the 6, yes, it's Bender's

17  report.

18          HEARING OFFICER DUBOW:  Here we've got

19  Bender's report.  What does he have--what does he

20  have?

21          THE WITNESS:  He does a learning

22  disability discrepancy determination.

wtk

53

1      HEARING OFFICER DUBOW:  Yeah, I know it
2  does that, but I was trying to get where his IQ,
3  where's he at.

4      MS. GOODMAN:  If I may, the IQ is in
5  there, yes.

6      HEARING OFFICER DUBOW:  Is that a--he had
7  a 75, is that, full-scale IQ of 75.

8      THE WITNESS:  Which puts him in the
9  borderline range, really.

10      HEARING OFFICER DUBOW:  But then, you look
11 at the Howard one, he's down in the--

12      THE WITNESS:  Sixty-seven.  Well, I mean,
13 it's different, but it's not all that different.
14 But it's highly discrepant from what his academic
15 scores are.

16      And if you look at Bender's report, the
17 part that's telling to me is if you look at the
18 last page, where he says, I'm trying to look at
19 this youngster and why he did so poorly on an IQ
20 test.  But if you look at the last page and in the
21 last paragraph, he says that this is a youngster in
22 urgent need of emotional and psycho/social support.

wtk

1    And if you look at the last sentence of that.  He

2    says, he very conceivably could become a danger to

3    himself and/or others.  So--

4              HEARING OFFICER DUBOW:  Which, wait a

5    minute, I'm looking at the last sentence.

6              THE WITNESS:  This is 2001.

7              HEARING OFFICER DUBOW:  1/17/01?

8              MS. GOODMAN:  It's the next page.  There's

9    an addendum to that.

10             HEARING OFFICER DUBOW:  Okay, the

11   addendum.

12             THE WITNESS:  Mm-hmm, last paragraph.

13             HEARING OFFICER DUBOW:  Thank you.

14             THE WITNESS:  Consistently, D██████ has

15   had difficulties with emotional status.  He's a

16   youngster who was prenatally exposed to drugs and

17   alcohol.  He had a seizure at three-weeks of age.

18   He has had various traumas.  He was hit in the head

19   with a brick in 1998.  He was hospitalized in 2002;

20   he currently is taking psyprexa [ph] and Topamax,

21   which is under the direction of Dr. Kala, K-a-l-a,

22   at Howard University Mental Health, who he's seeing

wtk

1   twice a month.

2           HEARING OFFICER DUBOW:  What are those

3   medications for?

4           THE WITNESS:  Yes, those are medications.

5           HEARING OFFICER DUBOW:  I mean, those

6   medications are for what, for the record?

7           THE WITNESS:  For chronic paranoid

8   schizophrenia.  In 2001, there was a diagnosis of

9   possible psychosis.  There have been, since then,

10  of mood disorder, chronic paranoid schizophrenia.

11  This is a youngster who has had, by history,

12  auditory hallucinations as was mentioned in the

13  opening statement but, also, visual hallucinations.

14          He's a youngster when he's at school and

15  this is current and at Francis, he's still getting

16  into fights that are significant physical fights.

17  Now, some of the teasing from what I can see that's

18  going on at Francis is teasing that any student

19  would perceive as being teasing.  Some of it is

20  that he places himself in the position of being a

21  victim because he is so afraid of being in school.

22  And his profile is such that he is vigilant for any

wtk

1  type of insult or threat.  And he is just afraid of

2  the other students.  he spends a good portion of

3  his day in the office with the principal.  He

4  spends a good portion of his day sitting with the

5  security officer up front.  And the security

6  officer has complained to the principal and said,

7  what shall I do with this youngster, he only wants

8  to stay with me.  He wont' go to lunch, he's afraid

9  and the principal said, he is afraid, just let him

10 stay with you.

11          He's not a small youngster.  He's older

12 than a lot of the other kids.  He also perceives

13 other kinds of things which I think are not

14 accurate.  He is concerned that he dresses

15 differently than the other students do.  And that's

16 just not accurate.  He is very vigilant for any

17 kind of insult.  There have been times where he

18 has, on a daily basis, he wanders through the

19 halls.  He has lots of absences from the class.  He

20 just--he doesn't attend very much.  His mood is

21 labile, it shifts up and down.  And he also has a

22 diagnosis, at one time of bipolar disorder.

1              He can be oppositional, defiant, violent.

2      Many of these things are by history.  In 2002 when

3      he was hospitalized at Children's National Medical

4      Center, his medications became much more stable.

5      At this point in time, they are holding him at a

6      point where it's, I believe that he can attend a

7      day school, if that day school is therapeutic

8      enough for him and the setting is small enough for

9      him to feel secure.

10             He is a youngster whose history is livid

11     with problems of emotional strength which I have

12     rarely seen.  But, at this point, he is more stable

13     but still having a great deal of difficulty.

14             Maybe you'd like me to elaborate on that?

15             HEARING OFFICER DUBOW:  You said you went

16     to High Road to observe there--so--

17             THE WITNESS:  No, to Francis to observe

18     him.

19             HEARING OFFICER DUBOW:  You went to

20     Francis, but you also went to High Road to observe

21     the program?

22             THE WITNESS:  Correct.

wtk                                                                        58

1              HEARING OFFICER DUBOW:   And the question

2    relates to High Road.

3              THE WITNESS:   Yes.

4              HEARING OFFICER DUBOW:   The witness prior

5    to you said it's a therapeutic environment, can you

6    explain, in light of the needs of this child if

7    they can meet that in the type of environment they

8    have or not?

9              THE WITNESS:   Yes, High Road is a program

10   that serves youngsters with emotional disturbance,

11   also youngsters with a learning disability or

12   comorbid codes.   It has, in the past, and at this

13   point in time, served youngsters who have

14   psychoses.   They only take youngsters for whom they

15   feel they can be effective.   So, he has been

16   through interviews; has seen licensed clinical

17   social workers there.   And they do a good job in

18   terms of keeping in touch with private

19   psychiatrists and also carry consult psychiatrists

20   themselves, mostly for youngsters who don't have an

21   outside psychiatrist.   But they have group therapy

22   there.   They have individual therapy there; they

1  have small classes.  They will meet with

2  [inaudible] as often as necessary to give

3  direction, although they don't do traditional

4  family therapy.

5          The system that they use in terms of

6  making youngsters feel safe, feel as though they

7  are being productive is to capitalize, as the

8  director said, on their strengths.  And make them

9  feel that they are being productive.  Their deficit

10 areas or their academic needs are supported well.

11 The special-education material which they use, by

12 special educators, by small classes, by a lot of

13 integration in terms of the related services.

14         Their emotional needs are served through

15 the therapy of many different types, but it's also

16 within the classroom.  So, the have homeroom at the

17 beginning of the school day; they have homeroom at

18 the end of the school day.  The licensed clinical

19 social workers often participate in the homerooms,

20 as well as some of the classes.  The students--all

21 students participate in what they call

22 "citizenship."  Two to three times a week, they

wtk                                                                    60

1   work with licensed clinical social workers on

2   social skills; on community-based projects; on

3   projects that are, well, creative in the sense that

4   the students initiate them.

5          They are a program with which I think can

6   add the therapeutic component that he's so badly

7   missing, as well as adding some safety and

8   security.

9          So, basically that's what his profile is.

10         MS. GOODMAN:   Mr. Dubow, I was going to

11  now ask Dr. Eiseman questions in reference to the

12  child find violation and the compensatory

13  education, unless you wanted to hear more in

14  reference to High Road.

15         HEARING OFFICER DUBOW:   And the

16  medications he's on--if he's off the medication

17  then, what happens.   Do they administer medication

18  at the school or does he have the kind of

19  medication he takes before he goes to school?

20         THE WITNESS:   He takes it at home.

21         HEARING OFFICER DUBOW:   He takes it at

22  home and it lasts through the school day?

1            THE WITNESS:  That's correct.

2            HEARING OFFICER DUBOW:  So, he doesn't

3   take medication at school?

4            THE WITNESS:  That's correct.

5            HEARING OFFICER DUBOW:  And if, for some

6   reason, the medication was to wear off or some

7   problems in the afternoon and this is the time when

8   he's in the general, you know, he's not in the

9   self-contained classroom at that time, he's moving

10  in the afternoon to the science, the other classes

11  he described.  They're also all special-ed kids,

12  and they're also small classes, but--

13            THE WITNESS:  It's also a very small

14  setting.  It's more like a town house than

15  anything.

16            HEARING OFFICER DUBOW:  I understand, but

17  I'm saying what provisions do they have to deal

18  with the situation if his--in the afternoon the

19  medications wear off and he has difficulties?

20            THE WITNESS:  Well, two things:  First of

21  all, the kinds of medications that he's taking are

22  the kinds that stay in your system, it's not like

wtk                                                        62

1  some of the stimulant medications that can wear off

2  very quickly.  So, it could take him a few days for

3  the medication to really get out of his system or

4  even longer.

5          HEARING OFFICER DUBOW:  Okay.

6          THE WITNESS:  But, secondly, they do a lot

7  of crisis-intervention there as necessary and they

8  have a team approach.  And part of that, I think

9  was explained by the director.

10         HEARING OFFICER DUBOW:  I don't have any

11 further questions.

12         MS. GOODMAN:  Okay.  Thank you.

13         BY MS. GOODMAN:

14   Q   Dr. Eiseman, you testified to reviewing

15 D▀▀▀▀ school records in disclosure documents.

16 From the documents, and based on your expertise,

17 what can you glean, if anything, about D▀▀▀▀

18 performance in second- and third-grades?

19   A   Yes, and what I'll try to do is give you

20 the years and the documents that pertain to each

21 year, as well as the--what I was able to see

22 through a document review each year.  And you asked

wtk                                                                    63

1   me in reference to the second-grade, which is 1996

2   and 1997.  Document, No. DA-15 represents his SAT

3   scores.  In second-grade, he was tested as being

4   below basic in all areas.  So, we see, even in

5   second-grade, he was having difficulties.

6       Q    Based on this performance, should D███████

7   have been referred for special-ed education

8   evaluation and services during this school year,

9   '96/'97?

10      A    I believe he should have, he was below

11  basic in all areas.

12      Q    If I may push you forward to third-grade,

13  did you specifically review DA-16 and 17 and 18,

14  D████████ third-grade report card and SAT-9

15  reports?

16      A    Yes, all of those documents, 16 through

17  18, have to do with the school year '97/'98, when

18  he was in third-grade.  And that was--continued to

19  be at Walker/Jones Elementary School.

20          He, also--as you can see from the

21  documents--took the SAT-9s and he's below basic in

22  all areas and it's very consistent.  His report

wtk                                                           64

1    card, I think is document No. 7--No. 18, and if you

2    look at the comments on that, you can see that he

3    is having difficulty with self-control in the

4    classroom.  He's having difficulty with

5    socialization with others.  He was disruptive in

6    class.  The comments section as well as some of his

7    grades, he had a hard third-grade year.  So hard

8    that, in fact, he was not promoted in that third-

9    grade year.

10        Q    Based on this performance in third-grade,

11   should D███████ have been referred for special

12   education during school year '97'98?

13        A    Yes, as a matter of fact, DCPS guidelines

14   at that time and still, indicate that if a

15   youngster is retained for a year they

16   automatically--

17             HEARING OFFICER DUBOW:  It's permissive

18   now, 1998 they revised it.  It used to be

19   mandatory, it's now permissive.

20             THE WITNESS:  It's not what?

21             HEARING OFFICER DUBOW:  I said, it used to

22   be mandatory--if a child was retained, they had an

wtk                                                                          65

1   affirmative obligation, they had to assess every

2   child that was retained.

3            THE WITNESS:   That's right.

4            HEARING OFFICER DUBOW:   That's no longer

5   the case, in 1998, the D.C. educational trustees in

6   authority agreed to amend it to indicate that now,

7   it's "may" "may" assess, so it's permissive.

8            MS. GOODMAN:   If I may, there's actually

9   two provisions, one says shall and one says may and

10  they're both still i n the regs.

11           HEARING OFFICER DUBOW:   I understand that

12  but the statutory--my interpretation of statutory

13  instruction is the latter predominates over the

14  former and the clear legislative intent was to make

15  it permissive.  So, I find the fact that it's still

16  on the books--the older one, doesn't--the intent

17  was that the new one is the one that has force and

18  effect.  The other's void, so that's the way I look

19  at that.  So, anyway, I'm just telling you that

20  there was a change in that.  So, it's permissive

21  under the current regulation.

22           THE WITNESS:   Right, at the end of the

wtk                                                                66

1  1998 school year, when he was in third-grade, he

2  was retained.  And in the 1998 and '99 school year,

3  he, once gain, was in third-grade.  and once again

4  was at Walker/Jones.  He did take the SAT-9 and he

5  was below basic once again.  His report card shows

6  unsatisfactory work skills and academic skills.

7  These are documents I'm looking at 19 through 20.

8          His report card, in fact, says that he is

9  in danger of being retained at the end of that

10  second third-grade year.  So, the intent there was

11  to consider retaining him for one more time in

12  third-grade.  That would have been his third year

13  in third grade.

14          BY MS. GOODMAN:

15    Q    So, based on his performance and his

16  second time around in third-grade, Dr. Eiseman,

17  school year '98/'99, should he have been referred

18  for special-education services, then?

19    A    He certainly should have by then.

20    Q    I'm moving forward now to fourth-grade,

21  school year 1999/2000, from your view of the

22  documents, which is a fourth-grade report and SAT-9

wtk                                                                        67

1   report, DA-21 and 22.  What, if anything, can you

2   glean about D██████ performance?

3       A    It was much the same.  He was below basic

4   in all areas.  His report card was a very poor one.

5   And, once again, in that year he was at

6   Gauge/Ekington School, he moved from Walker/Jones

7   to Gauge/Ekington.

8       Q    And based on this performance in fourth-

9   grade in '99/2000, should D██████ have been

10  referred?

11      A    He certainly should have been referred for

12  special education, but, instead what they did was

13  to retain him one more time.

14          HEARING OFFICER DUBOW:  And which--in

15  fourth-grade?

16          THE WITNESS:  At the end of fourth-grade,

17  the '99/2000 school year, what they did is to

18  retain him so that he repeated fourth-grade, once

19  again, at Gauge/Ekington for the 2000/2001 school

20  year.

21          BY MS. GOODMAN:

22      Q    Now, moving forward again to D████████

wtk

1   second year in fourth-grade, school year 2000/2001,

2   you reviewed this fourth-grade report and SAT-9

3   reports, as well?

4       A    I did.

5       Q    What can you tell us about those?

6       A    Those are documents 23 and 24, speaking to

7   his second fourth-grade year at Gauge/Ekington.

8   His year was also not successful.  The SAT-9s that

9   year, were below basic.  His report card talked

10  about difficulties in terms of social skills, once

11  again; work habits; academic skills; and, in fact,

12  if you look at document No. 24, the teacher talks

13  about him walking out of the classroom without

14  permission.  So we see an escalation, really, of

15  his emotional issues.  And during that year, there

16  was a referral to special education so that he was

17  tested beginning in January by DCPS and by the

18  Chesapeake Center.

19      Q    When you reviewed DA-6, which is the

20  January 2001 that you just referenced--

21      A    Yes.

22      Q    --what did this evaluation show about

wtk                                                                 69

1  D████████ level of functioning?

2      A    That report is the one that I--we

3  referenced before.  It talks about his level of

4  functioning as being, basically, in the borderline

5  range, which is inconsistent with his academic

6  achievement scores, as I stated before.  Where his

7  rating score was a 108; spelling score 100; reading

8  comprehension score of 94, that was an evaluation

9  that was done by Ted Bender.  At that point, he

10  recommended a clinical evaluation to look at the

11  escalating emotional needs.

12     Q    And in reference to the clinical

13  evaluation, DA-5?

14     A    Yes.

15     Q    What does this evaluation show about

16  D███████ level of function and recommendations

17  made?

18     A    He was referred for this clinical by Ted

19  Bender, as I stated before.  And just because it

20  was out of order, I'll repeat it at point.  Ted

21  Bender had said that he was urgently in need that

22  he conceivably become a danger to himself or

wtk                                                                    70

1  others, and then referred him for the clinical that

2  we see on DA-5.

3          The clinical was done at Chesapeake

4  Center--and--

5          HEARING OFFICER DUBOW:  Before you go on,

6  do you think it was accurate, Mr. Bender using the

7  WEA test for this child?

8          THE WITNESS:  Do I think it's accurate or

9  appropriate?

10         HEARING OFFICER DUBOW:  I mean, do you

11 think it's appropriate to use it on this child?

12         THE WITNESS:  Yeah, I think it's

13 appropriate to use it.  In terms of it being

14 accurate, these are not yes or no questions.  It

15 would be very hard for a student to score much

16 higher than he was capable of scoring on the test.

17 He is a youngster who had significant language

18 problems.  I would not have expected him to score

19 quite as high--

20         HEARING OFFICER DUBOW:  I ask because I'm

21 having a little problem understanding how he--

22         THE WITNESS:  Why he would use--

wtk                                                              71

1              HEARING OFFICER DUBOW:  --how he could get

2   108 and he's got all these severe language

3   problems?  I mean--

4              THE WITNESS:  Yes, and with some--

5              HEARING OFFICER DUBOW:  --I just--it just

6   doesn't seem to fit--

7              THE WITNESS:  --with some youngsters--

8              HEARING OFFICER DUBOW:  But then you see

9   and then you go, all right, I see, and then he has

10  a reading discrepancy score--

11             THE WITNESS:  Yeah.

12             HEARING OFFICER DUBOW:  --and his

13  discrepancy score is 2.2, but he has it in the

14  other way--

15             THE WITNESS:  In the other direction,

16  sure.

17             HEARING OFFICER DUBOW:  --in the other

18  direction.

19             THE WITNESS:  With some students, when you

20  see this kind of discrepancy and you know that they

21  have a language problem, it is warranted to give a

22  test which is not as language-based, which is more

wtk                                                                    72

1   performance-based.  With this youngster, though,

2   you can see in the performance parts of the WISK

3   [ph], which was given, he didn't do a whole lot

4   better.  And we do know that at this point, his

5   emotional needs were excessive.

6           These significant emotional needs

7   traditionally can bring down IQ scores.  They

8   affect IQ quite a bit.  So, I'm not surprised,

9   necessarily, that his IQ is that low because I

10  would suppose at that point in time he wasn't able

11  to cooperate very well.  I'm more surprised that he

12  was able to cooperate on the achievement tests.

13  So, possibly, that was a better day for him.

14          But I can't fathom that his IQ is truly

15  that low.

16          HEARING OFFICER DUBOW:  [inaudible] to

17  your earlier comments that the conclusions--that he

18  may be borderline or moderately mentally retarded,

19  that the Howard University said in '01 is

20  questionable because it's more the emotional

21  factors may have interfered with those testing

22  results?

1            THE WITNESS:  Yes, this is a youngster who

2    has always had emotional problems.

3            HEARING OFFICER DUBOW:  I mean, I'm having

4    a lot of trouble with Mr. Bender's results.   It's

5    not the first time I've had trouble--

6            THE WITNESS:  I'm having a lot of problems

7    with them for many reasons, but when they're this

8    discrepant, oftentimes I think that there's a need

9    for clarification and at least he did seek

10   clarification by asking for a clinical--

11           HEARING OFFICER DUBOW:  For a clinical,

12   okay, then you were going to go on--

13           THE WITNESS:  I was going to tell you

14   about the clinical.

15           HEARING OFFICER DUBOW:  --did the clinical

16   provide--what clarification did the clinical

17   provide would pin it all on this question?

18           THE WITNESS:  I don't know that it did.

19           HEARING OFFICER DUBOW:  It's a rather

20   weak--

21           THE WITNESS:  --but what it did--uh--

22           HEARING OFFICER DUBOW:  --it's a very

wtk

1 │ brief clinical.

2 │         THE WITNESS:  It is a brief clinical, but

3 │ what it did was to verify some of the things that

4 │ Ted Bender said, in terms of the emotional

5 │ disability.  And it did diagnose him with a

6 │ psychotic disorder and a mood disorder.  The kinds

7 │ of oppositional behavior; the bizarre behavior that

8 │ has been reported in Ted Bender's report and before

9 │ that, I think are highlighted here.  The interview,

10 │ the clinical interview that they did with him

11 │ showed how poorly he feels about himself; calling

12 │ himself a lamo [ph] loser.  This is a youngster who

13 │ didn't have the best start in life anyway; did have

14 │ the benefit of being taken by caring parents who

15 │ have worked hard with him, but he still has had a

16 │ very hard time and has shown suicidal and homicidal

17 │ ideation.  So, you know, schizophrenia is a very

18 │ significant disorder.  It's one of the most

19 │ significant disorders.

20 │         That was DA-5.

21 │         BY MS. GOODMAN:

22 │     Q    If I may point you to DA-4, which is the

1  speech-and-language evaluation conducted by DCPS.

2      A    Now, the speech-and-language valuation is

3  DA-4 and receptively he has a standard score of 65;

4  an expressive score of 53.  It was noted in this

5  that he--and still does--have very transgential

6  [ph] speech and language--so that if you're

7  speaking on a topic he's taken astray; what is

8  pulling him astray are the very associations which

9  he can't inhibit.  So, that is one very difficult

10  part of his language.

11      Another very difficult part are the

12  significant word-finding problems that he has.  He

13  does not make very good eye contact when you are

14  speaking one-to-one with him, and so that makes it

15  even more difficult and exacerbates the problems

16  that he has with the paranoia and this expresses

17  itself in school with poor socialization skills.

18      But the language disorder is severe; the

19  recommendation that came out of that was speech-

20  and-language therapy twice a week for 30 minutes.

21      Q    Dr. Eiseman, I want to point you to DA-3,

22  now, it's the clinical review done by DCPS of the

wtk                                                                    76

1    clinical evaluation that you just testified about.

2    If you could tell us what you gleaned from that, if

3    anything, in reference to D███████ level of

4    functioning, as well as the recommendations in

5    there.

6        A    DA-3 was the clinical which was done at

7    Atlantic Health Services.  And the findings of DA-3

8    were very similar to the other clinical that was

9    done.  The diagnosis was of a psychotic disorder,

10   mood disorder.  And that the symptoms, at that

11   point, were very serious.  The recommendations were

12   for individual therapy; for group therapy.  The

13   recommendations included a therapeutically

14   structured environment and referral to a

15   psychiatrist for an evaluation for medication that

16   was an antipsychotic, as well, as mood stabilizing.

17       Q    Were these recommendations followed?

18       A    Not by the school system, no.

19       Q    This evaluation is dated October or the

20   date of the report is October 2001, that is

21   D███████ fifth-grade year, did you--you testified

22   to it being on the record, so if you could look at

wtk                                                                    77

1    DA-25, it's D███████ fifth-grade report card.

2        A    Yes.

3        Q    Can you direct your expert testimony on

4    what this tells us about D███████ performance in

5    fifth-grade?

6        A    Yes, again, his grades were

7    unsatisfactory; social skills unsatisfactory, The

8    interesting thing about this report card is he was

9    in fifth-grade and he was promoted to seventh-

10   grade.  So he repeated third--

11            HEARING OFFICER DUBOW:  So, he went from

12   fifth to sixth?

13            THE WITNESS:  No, from fifth to seventh.

14            HEARING OFFICER DUBOW:  I'm sorry, he went

15   from fifth to seventh, he skipped sixth?

16            THE WITNESS:  Yeah, he had third-grade

17   twice, fourth-grade twice, and then he went to

18   seventh grade.  Not because he did so well.

19            HEARING OFFICER DUBOW:  And what was

20   fifth-grades scores, what document is that the

21   fifth-grade report card?

22            THE WITNESS:  The report card was 25.

1             HEARING OFFICER DUBOW:   That was 25?

2             THE WITNESS:   Correct.

3             HEARING OFFICER DUBOW:   One second, I want

4    to look at that.   Strange report card when you're

5    in the second-grade, it's the kind of report card

6    he got in the second grade.

7             THE WITNESS:   Yes.

8             HEARING OFFICER DUBOW:   You don't get a

9    report card like this now in Montgomery County

10   after third-grade, you get grades.

11            THE WITNESS:   Yeah.

12            HEARING OFFICER DUBOW:   You mean to tell

13   me, here he was in the fifth-grade--

14            THE WITNESS:   Fifth-grade.

15            HEARING OFFICER DUBOW:   --he's still

16   getting this kind of report card.

17            THE WITNESS:   That's correct, they're much

18   less specific than what would be used in Maryland.

19            HEARING OFFICER DUBOW:   In middle school,

20   he started to get the--that one that's DA-26, the

21   breakdown by grade?

22            THE WITNESS:   Yes.

1            HEARING OFFICER DUBOW:  So, in the fifth-

2    grade, he washington still getting ones, writing,

3    reading, math, below level.  And then you're saying

4    from there--from fifth, he went to seventh?

5            THE WITNESS:  He went to seventh, yes.

6            HEARING OFFICER DUBOW:  In seventh, would

7    that be DA-26?

8            MS. GOODMAN:  Yes.

9            THE WITNESS:  That would be the seventh-

10   grade--

11           HEARING OFFICER DUBOW:  When he was at--

12           THE WITNESS:  --the seventh grade report

13   at Shaw Junior High School.

14           HEARING OFFICER DUBOW:  --at Shaw, so

15   that's seventh.

16           THE WITNESS:  Correct, that's DA-26.  Now,

17   you can see, at Shaw, he certainly--there's

18   documentation of the behavior that I saw at Francis

19   recently, where he's skipping classes.  This is not

20   a student who stays home.  And he's never been a

21   student that stays home.  He goes to school, just

22   doesn't always go to class.  When he's afraid, he

wtk                                                                              80

1   stays with people he feels can keep him secure.

2   But on DA-26, you can see in the citizenship, he

3   has an absence of 52 times.  In math he has

4   absences of 32 times.

5         And he got a B-minus with 52 absences.

6         HEARING OFFICER DUBOW:  Doesn't take much

7   to be a citizen today.

8         BY MS. GOODMAN:

9    Q    Dr. Eiseman, I'd like to ask you questions

10  now about each of D▬▬▬▬ IEPs.

11   A    Sure.

12   Q    DA-7 is his initial IEP, which was

13  implemented at the beginning of his fifth-grade

14  year, which you just testified about.  From your

15  first-hand knowledge of the student, as well as

16  your review of the documents, does this IEP appear

17  to be an appropriate one for D▬▬▬?

18   A    No, absolutely not.  I mean, this was just

19  several months before he was hospitalized.  His

20  emotional disorder had escalated to the point where

21  this was a youngster with very significant needs.

22  They said that he needed a psychiatric evaluation.

1  They drew up a report card with only five hours of

2  special education.  Despite the emotional problems,

3  they gave him no counseling.  They didn't even have

4  socio/emotional goals on that IEP.

5          HEARING OFFICER DUBOW:  Which one is that,

6  now, that's DA-?

7          THE WITNESS:  Seven.

8          HEARING OFFICER DUBOW:  --seven, that's

9  the first time he was found eligible.

10         THE WITNESS:  Correct, and he was found

11  eligible  only--

12         HEARING OFFICER DUBOW:  Only in speech-

13  and-language, is that right?

14         THE WITNESS:  --only in speech-and-

15  language despite all of the emotional problems.

16  Certainly I would say it's appropriate to find him

17  eligible in speech-and-language, but not to the

18  exclusion of recognizing his emotional issues by

19  not giving him any services, any goals and

20  objectives, any behavior-intervention plan.  And

21  with him doing as poorly as he was doing, they

22  didn't provide for extension of his academic career

wtk                                                                    82

1   by providing extended school year.  So, he didn't

2   have that consistency.

3           BY MS. GOODMAN:

4       Q    Does this IEP have a behavior-intervention

5   plan?

6       A    No.

7       Q    Should there have been one?

8       A    Yes, I think you've already heard about

9   the issues that he's had that year and prior years

10  in terms of school, well recognized by his scores

11  but also by the report cards and evaluations, which

12  speak to the difficulties he was having

13  emotionally.  So, he certainly should have had a

14  behavior intervention plan.

15      Q    I'm going to ask you now about DA-8, which

16  is the May 15, 2002, IEP.  Doest this IEP seem to

17  be an appropriate one for D███████?

18      A    No.  It offers a few more hours, in terms

19  of special education.  There are now 10 hours of

20  special education.  But it misses the mark, because

21  it still does not have any service for counseling.

22  It does not have any goals and objectives, in terms

wtk                                                                          83

1    of socio/emotional goals and objectives.

2              HEARING OFFICER DUBOW:  And what's that,

3    DA-8?

4              THE WITNESS:  Eight.

5              HEARING OFFICER DUBOW:  And it still has

6    him only speech/language impairment.

7              THE WITNESS:  Yes it does.  It has no

8    behavior- intervention plan; no counseling; no

9    socio/emotional goals and objectives.  And, again,

10   does not provide for extended school year.

11             BY MS. GOODMAN:

12        Q    And this IEP was developed after D████████

13   had the in-patient psychiatric hospitalization,

14   isn't that right?

15        A    Yes.

16             HEARING OFFICER DUBOW:  This was after

17   which--in-patient--

18             MS. GOODMAN:  Psychiatric--DA-2.

19             THE WITNESS:  He was hospitalized from

20   April 25 to May 8, '02.  So, when this IEP was

21   drawn up, he was only out of the hospital for a

22   week.  And what was produced was an IEP with mo

wtk                                                                84

1   counseling--

2           HEARING OFFICER DUBOW:  CNMC is?

3           MS. GOODMAN:  Children's National Medical

4   Center.

5           HEARING OFFICER DUBOW:  Children's

6   National--he went into Children's National for

7   what?  What was, that's DA-2--

8           MS. GOODMAN:  That's DA-2.

9           THE WITNESS:  DA-2.

10          HEARING OFFICER DUBOW:  He was referred--

11          THE WITNESS:  And he--

12          BY MS. GOODMAN:

13      Q   Dr. Eiseman, if you could give us

14  information on DA-2 in terms of what it tells us

15  about D███████ emotional functioning?

16      A   D███████ came to Children's National

17  Medical Center because--well, he had a history of

18  illness, but also he was--had made suicide--

19  suicidal ideation.  He had heard voices and that

20  was the predominant reason.  And it's not unusual

21  for a student of this age who is going to be

22  diagnosed with paranoid schizophrenia to hear

wtk

1    voices at this age.  But that was the thing that

2    was very frightening him.  It was telling him that

3    he should run into a car or commit suicide, to harm

4    himself; to put his hands on the burner, the stove

5    burner.  Also talked about him setting the

6    apartment on fire.

7            If you look at Page 2 at the top of the

8    page when they say--

9            HEARING OFFICER DUBOW:  When they say--and

10   I don't mean to interrupt you.

11           THE WITNESS:  Yes.

12           HEARING OFFICER DUBOW:  When they said on

13   this chart diagnosis on DA-2, when they say on the

14   axis one, chronic, paranoid schizophrenic?

15           THE WITNESS:  Yes.

16           HEARING OFFICER DUBOW:  For the record,

17   can you tell what that would mean?  When they say

18   chronic?

19           THE WITNESS:  Chronic meaning that it is

20   present--it has been present, is likely to be

21   present and there's a guarded result.

22   Schizophrenia is not a passing disorder.  The

1   nature of schizophrenia and chronic schizophrenia,

2   generally indicates that there's a break from

3   reality.  And that break from reality is a

4   significant break that will affect functioning;

5   whether it's at school or in the community.

6          HEARING OFFICER DUBOW:  And so, by having

7   the word chronic there, indicates it will be an

8   ongoing?

9          THE WITNESS:  Yes.

10         HEARING OFFICER DUBOW:  Sorry.  Go ahead.

11         THE WITNESS:  so a week later, in answer

12  to your question, when an IEP is produced with no

13  socio/emotional goals; no behavior-intervention

14  plan; no counseling; about the only thing it did

15  recognize at that point is that he was getting

16  older and so they did put in a transition plane.

17  But he's aging out without services is what we're

18  seeing.

19         BY MS. GOODMAN:

20    Q    Dr. Eiseman, I'd like you to look at, now,

21  DA-10--I'm sorry, one moment--yes, DA-10--

22         HEARING OFFICER DUBOW:  It's the one, the

```
 1   IEP without the cover page, right.

 2            BY MS. GOODMAN:

 3       Q    Exactly, the IEP without the cover page,

 4   but these are the notes in reference to D_____ in

 5   seventh grade.

 6            HEARING OFFICER DUBOW:  It's '02/'04--

 7            BY MS. GOODMAN:  in school year--

 8            HEARING OFFICER DUBOW:  I mean '02/'03.

 9            MS. GOODMAN:  Yes, correct.

10            HEARING OFFICER DUBOW:  '02/'03 school

11   year for seventh grade.

12            MS. GOODMAN:  Yes, he skipped sixth grade,

13   went to the seventh grade.

14            HEARING OFFICER DUBOW:  So this is at

15   Shaw?

16            MS. GOODMAN:  Yes.

17            BY MS. GOODMAN:

18       Q    Dr. Eiseman could you--well, could you

19   tell us what these MDT meeting notes illustrate

20   about the level of services recommended for D_____

21   in seventh grade?

22       A    Yes, the MDT notes begin to recognize the
```

wtk

1   emotional problems that this youngster is suffering

2   under.  D████████ started at age nine, had emotional

3   problems.  This is on the first page, he began

4   hearing voices.

5           HEARING OFFICER DUBOW:  One second, I want

6   to find that.  DA-10?

7           THE WITNESS:  Correct, and on the first

8   page half way down the handwriting.

9           HEARING OFFICER DUBOW:  Okay, I got it.

10          THE WITNESS:  D████████ started at age nine,

11  having emotional problems.  He began hearing

12  voices; sleeping with knives; laughing at himself.

13  It recognized that he had been hospitalized and

14  had, at that point, been discharged from the

15  hospital.

16          The changed his speech-and-language

17  eligibility code to emotionally disturbed.  While

18  recognizing the fact that he had emotional

19  problems, they dropped his code for speech-and-

20  language impairment, which I have no reason to see,

21  whether through evaluation or any text that there

22  was reason to drop the speech-and-language

1  impairment.

2        On Page 3 of those notes, it talks about

3  him being very withdrawn in school; not speaking to

4  the other children in his classroom.  And we have

5  escalation of the isolated, more paranoid types of

6  behavior.  So they did change his classification

7  and at that point, recognizing that he had this

8  need which what they're now defining as being

9  emotional, they raised his hours of special

10 education to 16 and a half hours.

11       HEARING OFFICER DUBOW:  Is that a part of

12 the minutes?

13       THE WITNESS:  Yes, yes I had not seen that

14 before.

15       HEARING OFFICER DUBOW:  Sixteen and a half

16 hours?

17       THE WITNESS:  Sixteen-point-six-seven to

18 be exact.  They maintained the hour of speech-and-

19 language and for the first time, they gave him

20 counseling, they gave him an hour and a half of

21 counseling, at least on paper.

22       Now, for whatever reason, they dropped the

wtk                                                                          90

1   transition plan.  We still see no behavior-

2   intervention plan and no provision to promote

3   consistency through extended school year.

4          BY MS. GOODMAN:

5      Q    And he needed both behavior-intervention

6   plan and extended school year services?

7      A    Most definitely and a code of speech-and-

8   language impairment and transition goals.

9      Q    If I could point you now to DA-11, which

10  is the D████████ IEP in the eighth-grade dated

11  October 3, 2003.  DA-11, if you could tell us

12  whether this IEP was appropriate for D██████?

13     A    This IEP continues the code of emotional

14  disturbance; it does not recognize that he is a

15  child with a speech-and-language impairment.  I

16  cannot tell you why, but appears that they have cut

17  his services in half and come up with what I

18  believe is an odd number of 8.34 hours of special

19  education.  I've not seen that happen before so I

20  don't know what 8.34--I mean, it's more than a

21  class, but not much more than a class.

22          They continued one hour of speech-and-

1   language and reduced his services in counseling

2   from an hour and a half to one hour.  At that

3   point, they recognized that his need was moderate,

4   rather than a high-level of need, which, at that

5   point, it was.  There are no reading goals in this

6   IEP; no speech-and-language goals.  Again, the

7   counseling time is reduced; there's no behavior-

8   intervention plan; no provision for extended school

9   year; and no recognition that this is a youngster

10  who is eligible for speech-and-language.

11      Q    So, this wasn't appropriate for D████████,

12  either?

13      A    No.

14          HEARING OFFICER DUBOW:  There are MDT

15  notes, back on that one, right, yeah, D██████ will

16  receive 8.3 hours of specialized instruction--but

17  it doesn't say--I only see one hour.  I don't see-

18  there's no discussion why they reduced it, though,

19  right?

20          THE WITNESS:  That's correct.  In fact, if

21  you look at the page at the end of the IEP that

22  talks about the least restrictive environment--

wtk
                                                                    92

1            HEARING OFFICER DUBOW:  Yes.

2            THE WITNESS:  --it says, at the end of the

3    handwritten portion, he has certain behaviors that

4    cannot be dealt with properly in a general

5    education setting.  Yet, he is attending a general

6    education setting.  And what confuses me in terms

7    of why they dropped his hours of service is the

8    last page of he MDT notes, when Ms. Cherry, I

9    believe is the name, who is the social worker says

10   that D██████ will continue with his goals that he

11   had last year because he did not make most of them

12   or master, I guess that word is, master most of

13   them.  So, he hasn't made progress, yet they

14   dropped his counseling hours and give him fewer

15   hours to master the goals in the second year.

16           BY MS. GOODMAN:

17       Q   Dr. Eiseman this brings us to his current

18   IEP, which is DA-12.

19       A   Yes.

20       Q   From your first-hand knowledge of the

21   student and your review of the documents and your

22   expertise, is this IEP appropriate for D██████?

1       A    No.

2       Q    Why not?

3       A    For many of the same reasons.  He has ED

4  eligibility code, but not a speech-and-language

5  impairment; it offers him 15 hours of special

6  education; and one hour of speech-and-language and

7  one hour of counseling.  All of this is

8  insufficient.  This is a youngster who needs and

9  has needed a full-time therapeutic program.  There

10  are no speech-and-language goals and objectives.

11  And tragically, with a diagnosis of chronic

12  paranoid schizophrenia and I don't know a diagnosis

13  more severe than that.  This is a youngster who has

14  not socio/emotional goals; no behavior plan.  It

15  offers no extended school year and this entire IEP

16  is produced on outdated evaluations because he was

17  due for a triennial which was not done.

18      Q    Dr. Eiseman, according to this IEP, he was

19  supposed to be getting 15 hours of special

20  education.  In your visits to the school and

21  meetings with the teachers and staff, what did you

22  learn, if anything, as to whether he's getting

wtk                                                                    94

1  these 15 hours of specialized instruction?

2      A    Well, he's not getting the 15 hours of

3  specialized instruction because, number one,

4  because he's not scheduled for that much; but

5  number two, he's not in class a lot; he's spending

6  the time where he feels he can be protected, either

7  with the principal; the assistant principal; the

8  security officer.  The also is not receiving

9  speech-and-language, just as he didn't last year

10  and he's not receiving counseling, just as he

11  didn't last year.

12            HEARING OFFICER DUBOW:  How do you know

13  that?

14            THE WITNESS:  I asked.

15            HEARING OFFICER DUBOW:  Okay.

16            THE WITNESS:  It's a very difficult

17  situation.  This is a  youngster who was pushed

18  down the stairs, broke his leg in two places; gets

19  transferred out of that school; comes into the new

20  school; they make some provision for counseling,

21  but don't provide it.  And then they're have no

22  socio/emotional goals and objectives on the IEP.

1  So there's not a lot of way to protect this

2  youngster, which is, if anything, re-enforcing the

3  paranoia.

4        HEARING OFFICER DUBOW:  Did you look at

5  his schedule--his class schedule?

6        THE WITNESS:  Yes.

7        HEARING OFFICER DUBOW:  Is that consistent

8  with that IEP, I mean, with that report card, which

9  one was that, that there was a report card from

10  Francis, that's DA-27--DA-27.

11        THE WITNESS:  Now the DA--

12        HEARING OFFICER DUBOW:  So, if we look at

13  DA-27--26 actually, well, wait a minute.

14        THE WITNESS:  Twenty-seven.

15        HEARING OFFICER DUBOW:  Twenty-six is

16  Shaw, 27.  Okay.  I'm just going to go down these

17  with you.  You were there, right?

18        THE WITNESS:  I was there, yes.

19        HEARING OFFICER DUBOW:  How long were you

20  at school?

21        THE WITNESS:  Probably about two hours.

22        HEARING OFFICER DUBOW:  The first one it

1  says English.  Is that a regular English class?

2         THE WITNESS:  That is the special-

3  education English class.

4         HEARING OFFICER DUBOW:  That's special-ed.

5  The next one is American History, is that regular?

6         THE WITNESS:  Yes, it is.

7         HEARING OFFICER DUBOW:  Math fundamentals,

8  do you remember what that is?

9         THE WITNESS:  Yes, that was a regular math

10 class.  he also has--

11        HEARING OFFICER DUBOW:  Then he has that

12 first half algebra, was that regular?

13        THE WITNESS:  Yeah, I think kit was the

14 math fundamentals that was the special-education

15 and or--no I'm sorry, it's the first half of

16 algebra is special education; the math fundamentals

17 is not.

18        HEARING OFFICER DUBOW:  So the first half

19 algebra is special-ed?

20        THE WITNESS:  Yes.

21        HEARING OFFICER DUBOW:  And the reading

22 comprehension, is that a special-ed or--

1          THE WITNESS:  No, all the rest of the

2    courses are regular education courses.

3          HEARING OFFICER DUBOW:  All right health,

4    physical science, music.  Okay, those are all

5    electives, aren't they?  Okay.  This is his class

6    schedule would be too, these would indicate these

7    are what he gets every day?

8          THE WITNESS:  Yes.

9          HEARING OFFICER DUBOW:  They're in a block

10   system or whatever.  This is what he supposedly

11   gets?

12         THE WITNESS:  That's correct.

13         HEARING OFFICER DUBOW:  And so, out of

14   that the special-eds are English, first half

15   algebra, that's it?

16         THE WITNESS:  Correct.

17         HEARING OFFICER DUBOW:  And that would

18   come to how many hours, that's 15?

19         THE WITNESS:  No.

20         HEARING OFFICER DUBOW:  That would be ten,

21   at the most?

22         THE WITNESS:  That's correct.

1              HEARING OFFICER DUBOW:   That's forty,

2    they're not a block, right?

3              THE WITNESS:   They are not.

4              HEARING OFFICER DUBOW:   What are they 50

5    minutes--are they 50-minute classes?

6              THE WITNESS:   About 45, I think.

7              HEARING OFFICER DUBOW:   About 45?

8              THE WITNESS:   Yeah, but even if--

9              HEARING OFFICER DUBOW:   Two special-ed

10   classes.

11             THE WITNESS:   But even if you were

12   schedule for 3, I mean, they're not implementing

13   his IEP at all.

14             HEARING OFFICER DUBOW:   They're not--there

15   are no--the IEP does not address these topics?

16             THE WITNESS:   Well, first of all, it

17   doesn't address his primary need, which is the

18   socio/emotional need because it doesn't have any

19   goals and objectives to be working on.

20             HEARING OFFICER DUBOW:   Yeah, I know that.

21             THE WITNESS:   It doesn't have a behavior-

22   intervention plan--

wtk                                                                                    99

1              HEARING OFFICER DUBOW:  No, I know that,

2    but I'm saying it does have, have to go back to

3    this--

4              THE WITNESS:  It has some accommodations.

5              HEARING OFFICER DUBOW:   --DA-12--

6              THE WITNESS:  The accommodations, a child

7    can get from a 504 plan.

8              HEARING OFFICER DUBOW:  Right, but the DA-

9    -

10             THE WITNESS:  12.

11             HEARING OFFICER DUBOW:  The IEP has goals

12   on--I'm not saying whether they're good goals or

13   bad goals but just to say what the topics are--they

14   have transition, right?  There's on.  They have

15   mathematics.  They have written expression, reading

16   and that's it, right, those are the goals?

17             THE WITNESS:  That's correct.

18             HEARING OFFICER DUBOW:  All right.  Go

19   ahead, I'm sorry.

20             BY MS. GOODMAN:

21        Q    Dr. Eiseman, as you just testified to the

22   deficiencies in each of D██████ IWPs, and, as

wtk                                                                  100

1   well as to his academic and behavioral problems,

2   since 19--school year '96/'97 in your expert

3   opinion, was this child inappropriately served

4   educationally?

5        A    For which year are you asking for all of--

6        Q    From school year 1996/'97 through the

7   present?

8        A    Yes, absolutely.

9             HEARING OFFICER DUBOW:  When you went to

10  Francis?

11            THE WITNESS:  Yes.

12            HEARING OFFICER DUBOW:  You were there for

13  two hours?

14            THE WITNESS:  Yes.

15            HEARING OFFICER DUBOW:  And did you go

16  into any of the special-ed classes, if so, which

17  one, math or the English?

18            THE WITNESS:  I went into his math class,

19  his English class and then his health class.

20            HEARING OFFICER DUBOW:  So you went to

21  both the two special-ed classes?

22            THE WITNESS:  I caught the end of his math