wtk

1    class, but I stayed through all of the English

2    class and then the one regular education class.

3            HEARING OFFICER DUBOW:  Now, the English

4    class, did you talk to the teacher afterwards?

5            THE WITNESS:  Yes, and the English class

6    was--

7            HEARING OFFICER DUBOW:  Was he taught by a

8    special-ed teacher?

9            THE WITNESS:  Yes, Ms. Witcher [ph].

10           HEARING OFFICER DUBOW:  What did you

11   observe of him in that English class, if you

12   recall?

13           THE WITNESS:  In the English class, there

14   were nine students present.

15           HEARING OFFICER DUBOW:  Nine?

16           THE WITNESS:  Nine.

17           HEARING OFFICER DUBOW:  Mm-hmm.

18           THE WITNESS:  Eight students were sitting

19   up front with Ms. Witcher and D███████ was sitting

20   alone at the back of the room, not contributing,

21   occasionally following along, they were reading

22   "Odysseus."

wtk                                                                    102

1           HEARING OFFICER DUBOW:  They were reading

2  what?

3           THE WITNESS:  "Odysseus."

4           HEARING OFFICER DUBOW:  Okay.

5           THE WITNESS:  At the end of the class, the

6  students got out--got up from their seats and they

7  left the classroom.  He was the only student who

8  remained.  And the teacher explained to me that he

9  waits for the halls to clear a little bit because

10 he's afraid of the other students.

11          HEARING OFFICER DUBOW:  What else did you

12 observe in that English class, if anything that you

13 recall?

14          THE WITNESS:  That was about it in the

15 English class.  He was following along.  He wasn't

16 writing at all.  he was very self-contained.

17          BY MS. GOODMAN:

18     Q    What else, if anything did you learn from

19 Ms. Witcher, his English teacher?

20     A    She said he does some work but he doesn't

21 always come.  He says that he's too old for the

22 class.  She said that they did an IEP, he's going

wtk                                                                103

1   to be tested and they will do another IEP to place

2   him in another setting because the setting is not

3   appropriate for him.

4           HEARING OFFICER DUBOW:  Repeat what you

5   just said, the last sentence.  What did she say?

6           THE WITNESS:  that they were going to test

7   him and then they would do another IEP because they

8   needed to place him in another setting because this

9   setting was inappropriate for him.

10          HEARING OFFICER DUBOW:  Anything further?

11          BY MS. GOODMAN:

12      Q   In reference to your observation at

13  Francis, did you speak with any other staff about

14  D███████?

15      A   Yes.

16      Q   What, if anything, did you learn?

17      A   I spoke to the assistant principal, Ms.

18  Hill, and she told me that she had called Mom and

19  told her that he was going to be suspended because

20  he had kicked a child, and I quote, "in his private

21  parts."  But that suspension was revoked because of

22  extenuating circumstances, and I got the idea that

1    it was provoked.  I also spoke to Ms. Henderson,

2    the security guard who said he's afraid of the

3    other students, because they tease him so badly.

4    He stays with her, he will not eat lunch because

5    he's so afraid.  She says they tease him because of

6    how he dresses, which she believes, and I do, as

7    well, is perfectly normal dress.  But he perceives

8    that he dresses differently.

9           He believes that he is teased because his

10   head is shaved.  He believes--but there are lots of

11   other students who have their heads shaved, so I

12   don't think that's a reason.  He perceives that he

13   is teased because he's older.  Ms. Henderson asked

14   the principal what should I do with him, because he

15   doesn't go to class, he stays with me.  And the

16   principal said, let him stay with you, he's scared.

17          I also spoke to Ms. Gross [ph], who is the

18   coordinator of special education.  And she said

19   he's failing in math which she teaches.  He gets in

20   fights.  He doesn't come most of the time.  He

21   wanders the hall and sometimes the assistant

22   principal will find him and bring him back.

1          I also spoke to Mr. Dickens [ph] who is

2    the PE health teacher who said he attends about

3    half the time; he wanders the hall the rest of the

4    time and when he's in school, when he's in his

5    class, he sits in the back of the classroom.

6          BY MS. GOODMAN:

7    Q    You testified earlier that, in your expert

8    opinion, the child's been inappropriately served

9    since school year '96/'97,  In regards to his

10   speech-and-language impairment, which was

11   identified in July of 2001, is this a disability

12   that manifests itself at a certain age?

13   A    Language disabilities are developmental in

14   nature.  So, this is not a child who gained his

15   language and then lost it.  It developed as a

16   language disability with delayed, as well as

17   disordered acquisition of language.

18   Q    So when would this disability or the

19   speech-and-language impairment should have--when

20   should it have manifested itself?

21   A    Well, it was already manifested as far as

22   we can see, when he was recognized as having

wtk

1   speech-and-language problems in 2001.  We don't

2   have a lot of documentation before that of his

3   language problems other than report cards which

4   speak to his language.  But, as I said, language

5   acquisition starts, you start seeing language at

6   about a year old.  And i did not know him at a year

7   old, but children with language disorder or

8   language delay have a slower acquisition and a more

9   disordered acquisition of language.  So it would

10  have been present when school started, in

11  kindergarten.

12      Q    And, should DCPS have identified D████████

13  as having speech-and-language impairment, in

14  kindergarten?

15      A    I would say that it would have been

16  present in kindergarten, yes.

17      Q    In your review of D████████ records,

18  including his report cards.  In his expert opinion,

19  should D███████ been identified as a student in need

20  of special education services earlier than

21  September 19, 2001?

22      A    Yes.

wtk                                                              107

1        Q    And why is that?

2        A    Because this is a youngster who had

3   difficulties dating back to at least that I know

4   of, the second grade and that was '96/'97.  So, the

5   first document that we have that speaks to that is

6   DA-15 and that's an SAT--SAT-9.  And he was below

7   basic in all areas.

8             HEARING OFFICER DUBOW:  Was that first one

9   DA-19?

10            THE WITNESS:  Fifteen.

11            HEARING OFFICER DUBOW:  Fifteen.

12            BY MS. GOODMAN:

13       Q    So, based on your expertise, Dr. Eiseman,

14   has D███████ received an appropriate education at

15   anytime over his educational experience with DCPS?

16       A    Well, I can only testify back to second-

17   grade.

18       Q    Okay.

19       A    I would say, however, that in my expert

20   opinion, the likelihood is that he had a speech-

21   and-language impairment in kindergarten and first

22   grade that should have been picked up.  So, I think

wtk

1   that was likely.  But, definitively, it's second

2   grade.

3       Q    So, that's school year 1996/'97?

4       A    Correct.

5       Q    And because of the inappropriateness of

6   the education that D████████ received since 1996 and

7   '97, can you describe what it is that D████████ has

8   lost because of the inappropriateness of the

9   education?

10      A    Yeah, D████████ been put in a position

11  where he hasn't had appropriate support, both

12  academically and socially, behaviorally.  So this

13  is a youngster who's gone through all of these

14  school years sitting in a class where he's either

15  been retained in class; where he's experienced

16  skipping a class; where he has experienced being

17  isolated, withdrawn--the documents speak

18  consistently to him having problems with peers.

19          Some of the documents spoke to his

20  behaviors in class, which we later see as being pat

21  of the schizophrenia, some of the more unusual

22  behaviors, such as casting spells on students.

1   They look at it as manipulative, volitional kind of

2   behavior.  But we know that these kinds of

3   behaviors are part and parcel of the diagnosis of

4   significant psychoses.

5        So, he was untreated.  What he lost was

6   the ability to have opportunities for appropriate

7   intervention with peers.  With adults, the ability

8   to find more joy in the relationships that he has

9   in school because they are unsupported.  The

10  inability to gain an, in fact, showed some

11  regression, academically.  He suffered quite a bit

12  in terms of the loss over his school career.

13      Q    And if compensatory education were to be

14  awarded, putting appropriate education over the

15  past eight years, what form of compensatory

16  education would be appropriate for Delonte?

17      A    De████, if you look at eight years of

18  compensatory education 188 days per school year, a

19  six-hour school day.  And I'm not even looking at

20  lunch as being part of the academic day; although,

21  certainly socially it is--cd be a learning and

22  should be a learning experience for him, but you

1  come out with a huge number of hours.  You come out

2  with 7,200 hours.

3         My concern about D█████ is he's going to

4  go, hopefully, to a school where he can be in a

5  therapeutic milieu.  His medication is being

6  carefully monitored and appears to be much better

7  than it was before.  He's certainly not at a point

8  where schizophrenia can be said to be in complete

9  remission.  He's certainly suffering a great deal,

10 but he is not having the significant emotional

11 problems that he was before.

12        I certainly would like to see those

13 emotional problems be kept at bay; socialization

14 skills learned; academic skills impediments proved.

15 And if they are not, if they are exacerbated

16 further, I don't think that he would be able tot

17 maintain a day setting.  And it is not something

18 that I haven't thought about in terms of the

19 intensity of his emotional needs.

20        The therapeutic setting High Road has, the

21 individual; they have the family; he may need

22 family therapy--they have individual and group.

1  He, certainly, is going to need individual

2  tutoring.  During the summer months, through July 5

3  to August 5, they have extended school year, but

4  the month of August, they don't.  And it certainly

5  would be beneficial for him to be in a therapeutic

6  summer program.

7         He may need counseling above and beyond

8  what is at school privately so the counseling, the

9  tutoring, the therapeutic summer program would be

10  one way to use up some of those hours in terms of

11  comp-ed.  And could be reviewed by the IEP team

12  each year to see how many hours were used up.  And

13  then they would have  a notion of how many hours

14  they would have for the next year.

15         But as the team working with D███████

16  perceives what his needs are--and they go to

17  fluctuate--youngsters with these types of

18  disabilities, their needs to do fluctuate.  So, he

19  may need fewer services when he's doing well and

20  many more intensive services when he's doing not as

21  well.

22         Having the flexibility of those

1    compensatory education hours would be good.   It

2    may, in fact be at the end of--because he's 16--so

3    at the end of that, his term of school, when he's

4    facing transition into the community, may be that

5    those left-over hours translate into an extension

6    of his school career.

7            BY MS. GOODMAN:

8        Q    When you testified earlier, Dr. Eiseman,

9    about your familiarity with High Road, I just want

10   to ask, again, whether you think that High Road is

11   an appropriate placement for D██████?

12       A    It is at this point.   It offers the

13   support that he needs, both educationally and

14   emotionally.   It's a small protective setting.

15   More than anything else, that's what he needs, he

16   needs a small protective setting with teachers who

17   have the time to devote to a few students, rather

18   than many.

19       Q    Based on your expert opinion, what is the

20   danger, if any, of not providing D██████ with an

21   appropriate, full-time, special education

22   placement?

wtk

1        A    I think the danger is this is such an

2    unstable condition with him being in a setting

3    where there are violent acts every day, sometimes

4    committed by him; sometimes on him; sometimes

5    involving other students and not him.  But he is

6    predisposed and actively engaged in dangerous

7    situations.  So, it's a firecracker and it's

8    waiting to explode.  Besides that, there's

9    certainly a loss--all these years that he has not

10   been properly treated, he's lot opportunities for

11   socialization.  He's not going to socialize

12   appropriately unless it's facilitated.  He's just

13   too frightened.

14            So, there's a loss across the board.

15            MS. GOODMAN:  Thank you, I don't have any

16   other questions.

17            HEARING OFFICER DUBOW:  Cross-examination?

18            MS. RAMJOHN-MOORE:  No questions?

19            HEARING OFFICER DUBOW:  No questions.

20   Thank you, doctor.  Is there anything further, any

21   other witnesses?

22            MS. GOODMAN:  No other witnesses.

1           HEARING OFFICER DUBOW:  All right Parents

2    rest?

3           MS. GOODMAN:  Yes.

4           HEARING OFFICER DUBOW:  Do you wish to

5    make closing arguments at this time?

6           MS. RAMJOHN-MOORE:  Yes.  Hearing Officer,

7    we heard testimony stating that D█████ should have

8    been offered ESY services.  ESY services are

9    offered to students who are in danger of regressing

10   during the summer months academically.  ESY

11   services for a student who is afraid of other

12   students and attending school sounds a bit of in

13   contradiction to why we're here today.  Prior to

14   eligibility there were no significant behavioral

15   anecdotal notes present.  Nor did the teacher

16   comments in those report cards evidence a behavior

17   to a marked degree that would qualify a student as

18   emotionally disturbed.

19          This is important because the impact must

20   be educational.  Although grades not stellar,

21   there's not an indication of an emotional

22   disturbance, no child find violation.  As

1    retentions alone are not an indication of a need

2    for special education.

3          At least five IEPs and MDT meetings were

4    held with advocate and/or parents participated

5    meaningfully in the process.  Compensatory

6    education should be given, but only for services

7    not made available to the student not because the

8    student is refusing to attend school.  It's DCPS'

9    contention that although the student has missed

10   related services, it's by his own choice not

11   attending the services that are, in fact, offered

12   to him on his IEP.  And DCPS should not be held

13   accountable for eight years of compensatory

14   education based on the unsuccess [sic] of a student

15   at a [inaudible].

16          HEARING OFFICER DUBOW:  Counselor.

17          MS. GOODMAN:  Just first in response--in

18   response to DCPS's counsel's contention that the

19   missed services were due to the child not attending

20   class, that statement is not based on anything in

21   the record and, in fact, is contradicted by expert

22   testimony provided today, where we learned that the

116

1   child is not--D━━━ is not receiving speech-and-

2   language therapy or psychological counseling

3   because the school system is not providing it.  Not

4   because the child chooses not to attend.

5        Furthermore, DCPS has not met its burden

6   today, in any regard, there's been no evidence

7   provided.  What the documents, 1 through 40 or 1

8   through 39, as well as testimony from Dr. Eiseman

9   shows is that DCPS has denied a free and

10  appropriate public education to D━━━ for the

11  past eight years.

12        It was not identified until September

13  2001.  He should have been identified in school

14  year 1997/'98 at the latest.  The record is replete

15  with evidence showing a diagnosis of chronic,

16  paranoid schizophrenia, emotional disturbance,

17  speech-and-language impairment; struggles

18  behaviorally and academically since 1996/'97; SAT-9

19  scores, all below basic consistently; repeated

20  third-grade; repeated fourth-grade.

21        DCPS never provided D━━━ with the

22  educational services he needed starting from the

1   identification phase the whole way through to the

2   most current IEP and placement.

3           Currently, and Dr. Eiseman's testimony

4   illustrated this, that D███████ is getting into

5   fights daily; he's skipping classes; he isolates

6   himself from other students; is afraid of,

7   actually, interacting with other students;1 avoids

8   the hallways when classes are changing because he

9   can't be around the other students.  All of this

10  points to the inappropriate educational placement

11  at Francis.

12          D███████ needs a full-time therapeutic

13  program, with not only specialized instruction,

14  but, also, the speech-and-language therapy and

15  counseling that are recommended and required.  He

16  also needs a behavior-intervention plan; low

17  student/teacher ratio as the testimony of Dr.

18  Eiseman as well as David Emmonhizer from High Road

19  shows, High Road can provide him with those things.

20          We have also, quite dramatically,

21  testimony that staff at his current placement at

22  Francis more than one, Ms. Witcher and Ms.

1   Henderson have stated that this child is in trouble

2   and that Francis is not an appropriate placement

3   for D█████.  He's currently doing terribly

4   academically, as well, in addition to his emotional

5   and social problems.

6          And just very quickly, DA-his current IEP,

7   DA-12 is inappropriate.  It's inappropriate because

8   he needs full-time and isn't getting it.  There are

9   not speech-and-language goals; no socio/emotional

10  goals; no behavior-intervention plan; no extended

11  school year.

12         We have expert testimony that D█████

13  requires extended school year and it's not being

14  provided with this current IEP and that this IEP is

15  not even being implemented as written, he's not

16  getting the speech-and-language therapy or the

17  counseling.

18         IEP part of that--DA-303, DA-11, is also

19  inappropriate for the same reasons.  That also was

20  not being implemented.

21         The past IEPs dated September 2001; May of

22  2002; and October of 2002, DA-7; 8; and 10; those

wtk

1  are also inappropriate as Dr. Eiseman testified in

2  detail to each one not being able to meet D████'s

3  needs in not providing him with the services

4  necessary.  In terms of the violation of Child

5  Find, there's been no evidence whatsoever from DCPS

6  to rebut this contention.  DCPS has an affirmative

7  duty to identify all the children with disability--

8  all D.C. resident children with disabilities and

9  they failed here.  They did not identify D████

10 until September of 2001, when he was identified as

11 having a speech-and-language impairment which is

12 developmental in nature.  And Dr. Eiseman testified

13 that that is something that will present itself

14 quite early--as early as age one--but that, at the

15 very latest by kindergarten it's something that

16 would have presented itself and, therefore, DCPS

17 should have identified.

18       In addition to not finding him eligible

19 for special education early enough because of

20 speech-and-language impairment, there's also

21 numerous report cards and the SAT-9 reports showing

22 a student who is struggling tremendously with

1  academics, as well as the socio/emotional

2  functioning, all of that points to DCPS having had

3  the responsibility and duty to identify, at some

4  point, during those years, at the very latest by

5  school year '97/'98 which was when he was in third-

6  grade for the first time, and actually failed.

7         And in terms of the remedy that we're

8  requesting, the placement that the parent is

9  seeking is High Road Upper School, a placement that

10 is appropriate, testified to by Dr. Eiseman, as

11 well as the director of the program.   An

12 appropriate full-time therapeutic placement that

13 can provide him with the therapeutic milieu that he

14 needs, as well s the psychological counseling; the

15 speech-and-language therapy; as well as the small

16 therapeutic environment that he requires.

17        In reference to the compensatory-

18 education, we're asking for eight years of comp-ed.

19 The claim does go back to school year 1997/'98.

20 Dr. Eiseman testified to what specific form--

21        HEARING OFFICER DUBOW:  So, you're asking

22 day-for-day?

1          MS. GOODMAN:  I'm asking for--

2          HEARING OFFICER DUBOW:  Is that a tentacle

3    now, under "Reed" [ph] decision of the Court of

4    Appeal?

5          MS. GOODMAN:  Yes, it is I think an

6    appropriate request under "Reed" because we have

7    expert testimony describing the need for those

8    services that what the law says that D██████ has

9    suffered through the eight years of losses that he

10   has an inability now to have any appropriate types

11   of social interaction; he regressed academically;

12   there was a great deal of loss over the course of

13   eight years, including two years of retentions that

14   when you look at it in terms of each year, Dr.

15   Eiseman testified that it's--instead of a full

16   school day, it's a five-hour day and the

17   calculation does come to 7,200 hours of services.

18         And the specific form of the comp-ed would

19   take, actually various forms.  It could be

20   therapeutic services and interventions; a

21   therapeutic summer program; counseling services; as

22   well as, you know, more traditional compensatory

1   education award of academic tutoring.

2   Understanding that it's difficult to come to a

3   specific form when you're talking about such a long

4   period of violation.

5          Dr. Eiseman did provide testimony that

6   what she recommends is that the IEP team review the

7   comp-ed award each year.

8          HEARING OFFICER DUBOW:  Well, what about

9   Judge Joyce Green's [ph] opinion that there's a

10  three-year statute of limitations that comp-ed can

11  only go back three years?

12         MS. GOODMAN:  Well, we would--there is a

13  three-year statute of limitations in IDEA cases,

14  but there's also exceptions to that with the

15  continuing violation doctrine, which is what we

16  would argue here that this is not a situation where

17  DCPS is--well, it is a situation where DCPS's

18  inaction speaks to the totality of circumstances.

19  There wasn't one moment where there was a

20  violation, it's something that happened ongoing,

21  that was continuing.

22         That's the nature of a Child Find

1  violation, it's not something that necessarily,

2  there's not a moment when you can say after this

3  point, the statute of limitations applies.  It's

4  something that should have been--that D.C. was

5  responsible for identifying him early, but that the

6  violation of not identifying him is something that

7  happened over time.

8         HEARING OFFICER DUBOW:  And since the

9  child has been identified and received some special

10  ed--

11         MS. GOODMAN:  Yes.

12         HEARING OFFICER DUBOW:  --though, you

13  indicate it's woefully inadequate but he received

14  some educational benefit.

15         MS. GOODMAN:  Mm-hmm.

16         HEARING OFFICER DUBOW:  Does that affect

17  the award of comp-ed and/or does the fact that this

18  child on his own doesn't go to classes, wanders the

19  hall or doesn't participate, even though they may

20  have classes offered for him.  Does that affect the

21  award under the doctrine's equity?

22         MS. GOODMAN:  No, it does not.  In terms

1    of the child not being in the classroom, that is

2    something that--that's a safety issue, but that's

3    not an issue that--

4              HEARING OFFICER DUBOW:   That's a what

5    issue?

6              MS. GOODMAN:   A safety issue, the child is

7    not in class because he's afraid.   The child should

8    not be penalized for being in an inappropriate

9    placement if that's the reason he's not in the

10   class.

11             HEARING OFFICER DUBOW:   If they offer two

12   special-ed classes, in English and math and the

13   child decides not to go into those classes, under

14   the doctrines of equity--if they're offering it,

15   how is that--why would DCPS be obligated to provide

16   comp-ed for those classes they offered but he

17   refused to go to bc of he was afraid--whatever

18   reason he gave, but it was h is own volition, his

19   own decision not to go.

20             MS. GOODMAN:   Right, in some circumstances

21   I see how equity would strongly suggest that DCPS

22   not be held responsible for hours but--

1          HEARING OFFICER DUBOW:  I didn't count

2  that as an equitable remedy.

3          MS. GOODMAN:  That's true, but in this

4  case what is equitable is that the comp-ed be

5  provided for those hours because the school system

6  wasn't giving him the therapeutic interventions he

7  needed.  Had they been giving him the therapeutic

8  interventions he needed and the counseling that he

9  needed, then his socio/emotional functioning may

10  have been to the point where he'd be available

11  emotionally, as well as physically, for the

12  classroom.

13          So, equity here demands that not--

14          HEARING OFFICER DUBOW:  The size of the

15  class--the special-ed class was nine students,

16  which is the same as  High Roads.

17          MS. GOODMAN:  There's no aide in that

18  classroom.  So the student ratio is actually nine-

19  ten-to-one, versus five-to-one--0

20          HEARING OFFICER DUBOW:  There's a special-

21  ed teacher and an aide is just an aide, I mean,

22  it's not a special-ed teacher.

wtk

1       MS. GOODMAN:  But the testimony of the

2  High Road director indicated that all staff, all

3  classroom staff are trained in a therapeutic

4  intervention management.

5       HEARING OFFICER DUBOW:  Crisis

6  intervention.

7       MS. GOODMAN:  Crisis intervention, but

8  also a therapeutic program, so that would speak

9  volumes in terms of the difference between the 10-

10  to-one.

11       HEARING OFFICER DUBOW:  All right, I'm

12  going to order that the second form of the

13  Burlington and Carter Test has been met that the

14  High Road School Upper--the Upper School at High

15  Road in Washington is appropriate placement to

16  place the child, the student at High Road,

17  effective as soon as you get the transportation

18  over there.  Or can he go there by--he's 16, can he

19  take a subway there?  Where is it, the Upper

20  School?

21       MS. GOODMAN:  Yeah, it's--

22       MS. RAMJOHN-MOORE:  Taylor Street.

1          MS. GOODMAN:  It's Taylor Street, but

2     we'll, I'll fill out the transportation form and

3     get it to Maureen Anderson.

4          HEARING OFFICER DUBOW:  Well, I mean, he

5     could take tokens if it's--

6          MS. GOODMAN:  At this point, he's not able

7     to do public transportation on his own to a new

8     setting like that, but--

9          HEARING OFFICER DUBOW:  All right.  Okay.

10          MS. GOODMAN:  But if you say, effective

11     immediately, maybe we could get him there.

12     somehow, while the bus is being worked out.

13          HEARING OFFICER DUBOW:  Because I'm going

14     to take a little more time with the comp-ed issue,

15     I'm not fully satisfied that he's entitled for day-

16     for-day for eight years.  So, I need time to

17     consider that issue--

18          MS. GOODMAN:  Okay.

19          HEARING OFFICER DUBOW:  --because we're

20     going back eight years, but I don't want to stop

21     his immediate placement at High Road.  So, I will

22     have an interim order--I'll send an order that he

128

1   go there, but the comp-ed issue, I need some more

2   time on that issue and I would appreciate a memo,

3   if you wish to submit, either side, on the

4   applicability of the three-year statute of

5   limitations and whether it applies to this case.

6   Joyce Green versus  your Judge Kessler opinion that

7   it's a continuing.  And the other issue under

8   "Reed" that we no longer just do a day-for-day, but

9   it's to meet the particular needs of the child.

10  and there are some times when, maybe, that it can

11  fluctuate quite a bit.

12          MS. GOODMAN:  Mm-hmm.

13          HEARING OFFICER DUBOW:  So, I'd appreciate

14  your thoughts on that.  So, I will enter an order

15  as to the placement, but I will give you each a

16  week to submit a memorandum on both "Reed" and on

17  the three-year statute of limitations questions.

18  Today is--yeah, so what would be May?

19          MS. GOODMAN:  Ninth.

20          MS. RAMJOHN-MOORE:  Oh, May ninth.

21          HEARING OFFICER DUBOW:  All right, I'll

22  give you the weekend, too, so the close of business

129

wtk

1 | on Monday.

2 |       MS. GOODMAN:   Thank you.

3 |       MS. RAMJOHN-MOORE:   Thank you.

4 |       HEARING OFFICER DUBOW:   All right, thank

5 | you all very much.

6 |       [Whereupon, the hearing was concluded.]

# C E R T I F I C A T E

I, hereby certify that the tape recording represented by the foregoing pages were transcribed by me; that the foregoing transcript is a correct and accurate record of the proceedings to the best of my knowledge, ability and belief.

*William T. Kennedy*

**WILLIAM T. KENNEDY**

**TRANSCRIBER**

wtk                                                                          1

T6846                GOVERNMENT OF THE DISTRICT OF COLUMBIA

                          DEPARTMENT OF PUBLIC SCHOOLS

                          OFFICE OF STUDENT HEARINGS


- - - - - - - - - - - - - x
                          :
In the Matter of:        :
                          :
D███████ A███████        :
                          :
- - - - - - - - - - - - - x

                              Washington, D.C.

                              Wednesday, October 26, 2005


          The above-entitled matter came on for

hearing, pursuant to notice.

BEFORE:

          SY DuBOW, Hearing Officer


APPEARANCES:

     On Behalf of the Student/Parent:

          TRACY GOODMAN, ESQ.


     On Behalf of D.C. Public Schools:

          [No one present from DCPS]


          [TRANSCRIPT PREPARED FROM A TAPE RECORDING.]

wtk                                                                    2

## C O N T E N T S

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---------|--------|-------|----------|---------|
| David Eminheiser | 6 | -- | -- | -- |
| Jennifer Murphy | 53 | -- | -- | -- |
| Dr. Sheila Eisman | 71 | -- | -- | -- |

## E X H I B I T S

| STUDENT/PARENT | MARKED | ADMITTED |
|----------------|--------|----------|
| Nos. DA-41 to DA-47 | | [previously] |

wtk                                                                3

<u>P R O C E E D I N G S</u>

1

2          HEARING OFFICER DuBOW:  We're on the

3    Record.  This is the continuation of the

4    Administrative Hearing for D████ A█████.  I'm

5    going to ask everybody to introduce themselves for

6    the Record at this time.  Ms. Goodman.

7          MS. GOODMAN:  I'm Tracy Goodman, on behalf

8    of Parent, Corene Anthony [ph].

9          MS. ANTHONY:  Corene Anthony, I'm

10   D████████ mother.

11         DR. EISMAN:  Dr. Sheila C. Eisman,

12   Educational Consultant for the Student.

13         MS. MILLER:  I'm Megan Miller [ph], I'm an

14   investigator at the Children's Law Center for Tracy

15   Goodman.

16         HEARING OFFICER DuBOW:  And, sir, you, on

17   the telephone?

18         MR.  I'm David Eminheiser [ph] I'm the

19   Director of High Road Upper School of Washington,

20   D.C.

21         HEARING OFFICER DuBOW:  Yes, I know you

22   well.  I'm going to--Mr. Eminheiser, I'm going to

wtk

1  swear you in now.  The hearing was supposed to take

2  place at 9:00 o'clock.  It is now almost 9:30 and I

3  have no representative from DCPS, so I will note

4  that for the record, but we're going to proceed.

5  This is a continuation of the hearing I had

6  earlier. I had entered an Order placing the child

7  at your school at High Road and the remaining issue

8  was the one of compensatory education.  So, in

9  light of a recent appeals court decision from the

10  D.C. Circuit in the "Reed" case and looking at the

11  child's short-fall and a flexible approach to this

12  issue, I need, I called this hearing to see how

13  he's done since he entered High Road.  He started

14  High Road back--he entered in May, isn't that

15  correct?

16          THE WITNESS:  That's correct, May 10 was

17  his first day of enrollment.

18          HEARING OFFICER DuBOW:  Right May 10.

19          THE WITNESS:  And--

20          HEARING OFFICER DuBOW:  Wait a minute, I

21  haven't sworn you in yet.  I just wanted to lay the

22  groundwork of what we're here for. So, May 10, he

wtk                                                                        5

1    began.  So, at this time--so, I want to be able to

2    see how he's progressed at your school and so

3    that's the purpose of this hearing to see where

4    he's at and what he needs.  And, so, for that, Mr.

5    Eminheiser, I'm going to call you--is that all

6    right, Ms. Goodman--

7              MS. GOODMAN:  Yes.

8              HEARING OFFICER DuBOW:  --as the first

9    witness.

10             MS. GOODMAN:  Yes.

11             Whereupon,

12                   DAVID EMINHEISER

13   was called as a witness and, having been first duly

14   sworn by the Hearing Officer was examined and

15   testified as follows:

16             HEARING OFFICER DuBOW:  As a preliminary

17   matter, I have documents that have been given to me

18   by the Children's Law Center, by Ms. Goodman,

19   labeled DA-41 to DA-47, that are entered into the

20   Record at this time.  And Some of these documents,

21   Mr. Eminheiser, are your documents.  So, do you

22   have a copy of them?

wtk                                                                          6

1          THE WITNESS:  I do.

2          HEARING OFFICER DuBOW:  Okay, all right,

3   I'll let Ms. Goodman ask you some questions, but to

4   help me out, this is really a hearing to help me

5   out--to find out where he's at.  I'd like, he

6   started May.  What I'd like to know--get a baseline

7   of where he was on May 10 and where he is today.

8   So, can we do that?  And, if that's possible, that

9   would help me.

10         MS. GOODMAN:  Just to clarify an issue,

11  since he has already been in the Record, there's

12  already evidence of his work background, what the

13  job entails--

14         HEARING OFFICER DuBOW:  Yes, I understand,

15  you already were at the earlier hearing, so I

16  understand.

17                  DIRECT EXAMINATION

18         BY MS. GOODMAN:

19     Q   Mr. Eminheiser, hello.

20     A   Good morning.

21     Q   D████████ attended High Road since May 10,

22  2005, correct?

wtk                                                                    7

1      A    That is correct.

2      Q    And did D███████ attend extended school

3   year in 2005?

4      A    He did not.

5      Q    And can you explain why not?

6      A    Even though he was on the list approved

7   from DCPS, the transportation was never provided.

8   We made numerous phone calls, I believe.  We have a

9   five-week ESY and it was in the third week before a

10  bus was even--showed up at D███████ house to pick

11  him up.

12     Q    Okay

13     A    And by that point, D███████ was so

14  discouraged that he refused to get on the bus.

15     Q    Okay.

16     A    So, he never attended ESY.

17     Q    Okay.  And D███████ currently attending

18  High Road, correct?

19     A    Yes, he is currently attending.

20     Q    Have you reviewed D███████ current IEP

21  dated June 16, 2005, which is DA-44?

22     A    Yes.

wtk

8

1          HEARING OFFICER DuBOW:  One second, just a

2    clarification.

3          MS. GOODMAN:  Yes.

4          HEARING OFFICER DuBOW:  When does your

5    school year start after your ESY for the fall, when

6    does that start?

7          THE WITNESS:  ESY ended on August 5 and

8    the regular school year students showed up on

9    August 29.

10          HEARING OFFICER DuBOW:  So, regular

11    school, it starts August 29?

12          THE WITNESS:  Yes.

13          HEARING OFFICER DuBOW:  Okay, thank you.

14          BY MS. GOODMAN:

15      Q    And D██████ did start this school year on

16    August 29?

17      A    Yes, he did.

18      Q    Back to the IEP dated June 16, '05--this

19    IEP was created at High Road?

20      A    It was.

21      Q    Can you, please, describe what services

22    that D██████ is currently receiving pursuant to

1  this IEP?

2       A    His services are 26.5 hours of specialized

3  instruction, which we provide with individualized

4  and small group, in terms of math and English, he

5  does what we call the rotation.  In the content

6  areas of social studies, sciences, things like

7  that, he is in small classrooms

8  with--[unintell.]--special-education program.  So,

9  he's at full-time specialized instruction.  So,

10 psycho-social counseling of 2.5 hours per week. We

11 provide that, he gets two one-hour sessions of

12 group, a week, plus a half-hour of individual; and

13 we have licensed social workers on-staff who

14 provide those services.  He also receives one hour

15 of speech-and-language services from--we have a

16 licensed SLP and she is contracted.  So she comes

17 in, I believe Tuesdays to meet with D█████ for

18 that hour.

19      Q    Okay.

20      A    Every week.

21      Q    Mr. Eminheiser, you testified earlier that

22 you did review the documents that the Parent has

wtk                                                                10

1   submitted in it's disclosures?  The documents DA-41

2   through DA-47?

3        A    Yes.

4        Q    You also testified, in May, about your

5   knowledge of D██████ mental health history in the

6   previous documents.  I'm going to ask you a few

7   questions in reference to that.  You testified in

8   May that you are responsible for the administrative

9   and educational day-to-day functioning of the

10  school?  Does this include you being involved in

11  actual classroom observations and participation in

12  instruction and interaction with the students?

13       A    Yes, it does.  I do informal observations,

14  just throughout the day--I walk through the school

15  and I'll go in and stop by classrooms, as possible.

16  And, then, I also do scheduled, as well as

17  unscheduled more formal observations, where I would

18  go in and actually sit for a few minutes or half an

19  hour or so and observe the classroom.

20            We also have teams that I participate in

21  with the teacher, social workers, whatever the team

22  would get together and, maybe, discuss what's going

wtk                                                                    11

1    on in the classroom; about a particular student

2    that we might be having questions about.

3         Q    So, do you have occasion to interact and

4    observe D██████, specifically, in the classroom and

5    school setting?

6         A  I do.

7         Q    Do you, then, have first-hand knowledge of

8    D███████ current social and emotional functioning

9    and academic performance at High Road?

10        A  I do.

11        Q    How would you assess D████████ current

12   social/emotional functioning at school?

13        A    His current social/emotional functioning

14   at school, I would say--if I had to give one word,

15   it would be guarded.  He is--right now showing some

16   very--sort of serious emotional difficulties.  He

17   is withdrawn from his peers and he sort of

18   disconnected from them.  He does a little bit

19   better with adults, but not--he's really not on an

20   interaction-level of a typical 15-year-old young

21   man, at all.  If a lot of [unintell.] actions.  He

22   does not provide the main verbal--the motive cues

wtk                                                                    12

1   that often go along with communication, such as

2   poor eye contact, things like that.  And just that

3   emotional component to what he's saying, which

4   is--it's difficult to, interpret what he's really

5   thinking and feeling.  And, especially, with his

6   peers who, aren't going to necessarily--they're

7   getting upset by that.  They're not going to

8   understand what and how to interact with him.

9           Most recently, he's also showing signs of

10  problems in depression.  I'm not a clinician, so

11  I'm not diagnosing that.  But he is not eating at

12  time.  He is talking about things, like, he wants

13  to eliminate his peers; ask how he wants to do

14  that, he's going to bake them cookies.  So, not

15  exactly reality-based.  And, then, he also is doing

16  a lot of sexualized comments and things like that

17  in the classroom.

18      Q     You mentioned that--you testified that

19  D███████ is guarded and he's--you used the word

20  disconnected from his peers?

21      A     Yes.

22      Q     Can you comment about his social skills as

wtk

1  it relates to interacting with peers?

2      A    I would say that he has really poor social

3  skills at this point.  Like I was saying with

4  the--with the missing affective piece of

5  communication, it's difficult for his peers to

6  understand--with dealing with what he's trying to

7  say and to interact with him.  Emotion is a big

8  piece of communication, especially on the social

9  level.  If you're talking about [unintell.] facts

10 or something like that, it's not so important,

11 which, as an instructor with adults, he does do

12 better.

13     Q    You did mention--and you just testified

14 again that he does better with adults.  Are there

15 any other strengths in regards to D███████

16 social/emotional functioning that you've seen

17 develop since his enrollment at High Road?

18     A    I would say, one of his biggest strengths

19 is that he is very able to ignore negativity from

20 peers; whether that's sort of directed at him or

21 that's just happening around him.  Sometimes with

22 teenagers, they can be a little bit off-task and

wtk

1  things like that and he does a very good job of

2  ignoring that and stays fairly focused on what his

3  assignments are.

4      Q   Thank you.  I now want to ask you

5  questions about D██████ current educational

6  performance and status.

7      A   Yes.

8      HEARING OFFICER DuBOW:  Before we go on,

9  it may be helpful if I--just for clarification, as

10  you go through each section, maybe, if I could ask

11  additional questions--

12      MS. GOODMAN:  Oh, of course--of course.

13      HEARING OFFICER DuBOW:  I don't want to

14  interrupt your flow, but--

15      MS. GOODMAN:  --no, please, thank you.

16      HEARING OFFICER DuBOW:  --it may help me.

17  Let's--on the social/emotional piece, when he came

18  to High Road on--can you describe--on May 10--are

19  you able to describe how he was social/emotionally

20  at that time?

21      THE WITNESS:  He was very similar to the

22  way he is now.  It is, but probably a little bit

wtk

1    more, a little bit more of it.  When he was first

2    coming into the setting, he did not know staff; he

3    did not trust staff, so his openness and his

4    communication with staff are often equal to the way

5    it still is with the peers.  There was not a

6    connection that would be made right away.

7         His interactions with students was--he was

8    very much withdrawn--he did not have friendships

9    that developed--typically, when a student comes in,

10   it may take a day or so before there's a sort of

11   friendship that's developed, and he did not.  And I

12   would say, lately, I don't see any evidence, still

13   of any friendships that are within the school.

14        He's very isolated; he's very to himself

15   and he's a little bit paranoid of the students that

16   are in the classroom.  When he would--I don't

17   remember exactly when it was, but last school year,

18   maybe a week or two after he started, we had a long

19   conversation with his mother about him being

20   paranoid about the way that the rest of the

21   students in the classroom were talking.  That

22   whenever two students were whispering to one